ROXANNE MONTALVO, on behalf of herself and all other persons similarly situated, Plaintiffs-Appellees, *v.* ANDREW CHANG, in his capacity as Director, Department of Social Services and Housing, State of Hawaii; DEPARTMENT OF SOCIAL SERVICES AND HOUSING, State of Hawaii; STATE OF HAWAII, Defendants-Appellants

(CIVIL NO. 52895)

VIOLET ARBAS and SHARLEEN LEE, on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellees, *v.* ANDREW CHANG, in his capacity as Director, Department of Social Services and Housing, State of Hawaii; DEPARTMENT OF SOCIAL SERVICES AND HOUSING, State of Hawaii; STATE OF HAWAII, Defendants-Appellants

(CIVIL NO. 49483)

DANIELLE VON HIRAM and VIOLET ARBAS, on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellees, *v.* ANDREW CHANG, in his capacity as Director, Department of Social Services and Housing, State of Hawaii; DEPARTMENT OF SOCIAL SERVICES AND HOUSING, State of Hawaii; STATE OF HAWAII, Defendants-Appellants

(CIVIL NO. 50943)

NOS. 7289, 7696, 7697

FEBRUARY 25, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ., AND RETIRED JUSTICES OGATA AND MENOR ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY NAKAMURA, J.

These consolidated appeals concern attorneys' fees awarded by the Circuit Court of the First Circuit after the entry of judgments against the State of Hawaii, its Department of Social Services and Housing, and the Director of the Department, Defendants-appellants (hereafter referred to collectively as the State), in three class actions brought by recipients of financial assistance under the Aid to Families with Dependent Children program (hereafter AFDC). The State asserts attorneys' fees should not have been awarded because HRS § 346-33[1] renders public assistance payments

---

[1] HRS § 346-33 provides:

Assistance payments inalienable. Assistance payments and compensation paid by the department of social services and housing to blind persons and other persons for work performed in their homes or in workshops shall be inalienable by any assignment, sale, attachment, garnishment, execution, or otherwise.

inalienable. Assuming *arguendo* that the awards of attorneys' fees are not statutorily precluded, the State maintains the circuit court nevertheless abused its discretion in determining the amounts. Plaintiffs-appellees counter with a proposition that the State lacks standing to appeal as it was not aggrieved by the circuit court's orders. We agree with the State that it has standing to appeal from the orders awarding fees and with Plaintiffs-appellees that HRS § 346-33 does not inhibit the circuit court's power to award fees in the situations involved. We conclude, however, that the circuit court erred in fixing the awarded amounts, and remand the cases for redeterminations of the fees.

## I.

AFDC is a program established by Title IV of the Social Security Act, 42 U.S.C. §§ 601-613, and "designed to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them," *Shea v. Vialpando,* 416 U.S. 251, 253 (1974). It "is based on a scheme of cooperative federalism," *King v. Smith,* 392 U.S. 309, 316 (1968), "financed in large measure by the Federal Government on a matching-fund basis, . . . [where] participating States must submit AFDC plans in conformity with the Act and the regulations promulgated thereunder." *Shea v. Vialpando, supra,* at 253. Although the States are given broad discretion in administering the program, noncompliance with federal requirements can result in a cut-off of matching funds. *Rosado v. Wyman,* 397 U.S. 397, 420-23 (1970). Each complaint here alleged the State was out of compliance in some respect with applicable provisions of the governing statutes and regulations.

The plaintiffs in Arbas v. Chang, Civil No. 49483, acting on their own behalf as well as for all other recipients of public assistance similarly situated, challenged the State's practice of regarding federal and state tax refunds as "income" for AFDC purposes, a procedure which afforded a recipient the unenviable choice of a forfeiture to the State of all or part of the refunds or a reduction, suspension, or termination of AFDC benefits. The circuit court certified the plaintiff class,[2] and subsequently entered a partial sum-

---

[2] The class was certified to include:
all former and/or present recipients of Aid To Families With Dependent Children in the State of Hawaii, who, since September 23, 1974, have been required to

mary judgment against the State.[3]

The named plaintiffs in Von Hiram v. Chang, Civil No. 50943, another class action,[4] alleged the State was out of conformity with 42 U.S.C. § 602(a)(7) and related federal regulations because it did not permit recipients of assistance to deduct from income all expenses reasonably attributable to employment in determining eligibility for assistance payments under AFDC. They claimed *Shea v. Vialpando, supra,* had previously invalidated the State's practice of only allowing standardized deductions of $33 and $44 as work-related expenses. Thereafter, it was stipulated by the parties that the entry of a judgment in favor of the plaintiff class was appropriate, and the State was ordered to pay each member of the class the sum he or she would have received but for the State's adoption of the illegal procedure.

In Montalvo v. Chang, Civil No. 52895, also a class suit,[5] the representatives of the plaintiff class claimed that the State's refusal to consider child support payments payable to family units eligible for AFDC aid as unearned income for eligibility purposes and its further refusal to disregard the first $5 thereof in computing en-

_____

forfeit all or part of their federal and/or State income tax refunds to Defendants or in lieu thereof, have had their regular public assistance grant reduced, suspended or terminated due to their receipt of such income tax refund but does not include those persons, who obtained refunds based on a fraudulent basis or by falsely claiming a lesser or greater exemption.

[3] While the order granting partial summary judgment does not mention Kaisa v. Chang, 396 F. Supp. 375 (D. Haw. 1975), it is evident that the federal district court's decision in the foregoing case which declared the practice in question invalid was a primary factor in the circuit court's award of judgment.

[4] The circuit court certified that

[p]laintiffs Danielle VonHiram [sic] and Violet Arbas shall be representatives of the class of all former and/or present recipients of Aid To Families With Dependent Children in the State of Hawaii, who, since March 8, 1975, have not had actual work-related expenses deducted from gross income after applicable disregards, as those terms are defined in the judgment filed herein.

[5] This case was also certified as a class action with Roxanne Montalvo as the representative of

all persons similarly situated who are needy AFDC family units who have assigned their child support payments to the Department of Social Services and Housing, State of Hawaii, and who have received up to FIVE DOLLARS ($5.00) less per AFDC child in their total monthly income as a result of this assignment to and collection by Defendants of their child support payments pursuant to present statutory and regulatory provisions.

titlement to assistance were in violation of 42 U.S.C. § 602(a)(28), related federal regulations, HRS Chapter 346, and related state regulations. Since a federal district court had previously ruled that the State had breached relevant federal statutory provisions and regulations in the foregoing respects,[6] a stipulated judgment in favor of the plaintiff class was deemed appropriate in this case too.

Subsequent to the entry of the judgments, the circuit court awarded attorneys' fees to the attorneys representing the plaintiff classes. In each case, the fees were made payable from the common fund created by the terms of the judgment. In Montalvo v. Chang, the attorneys for the plaintiff class were awarded approximately fourteen percent of the amount recovered under the judgment as their fees; the attorneys for the plaintiff classes in Arbas v. Chang and Von Hiram v. Chang were allowed approximately twelve percent of the judgment amounts as fees.[7] The State appealed from the orders awarding fees in all three cases. And as similar issues are posed by the appeals, they were consolidated for argument and disposition.

## II.

We initially address the issue of the State's standing to appeal from the orders awarding attorneys' fees.

The State in the view of plaintiffs-appellees lacks requisite standing because it has not been "aggrieved" by the orders. In a sense they are correct, for the sums allowed their attorneys as fees are payable from funds which are no longer within the State's control and the orders apparently imposed no further liability upon the State. Yet, we have not been inclined to treat appeal rights lightly; "the policy of this court has always been to permit litigants, where possible, to appeal and hear the case on its merits." *Jones v. Dieker,* 39 Haw. 208, 209 (1952); *Jordan v. Hamada,* 62 Haw. 444, 451, 616 P.2d 1368, 1373 (1980).

---

[6] On September 23, 1977, in Lynch v. Chang, Civil No. 77-0172, the United States District Court for the District of Hawaii held that the practices in question were not consistent with pertinent federal statutory provisions and regulations.

[7] Apparently there was no contingent fee agreement between class representatives and attorneys in any of the cases.

HRS § 641-1(a) provides that "[a]ppeals shall be allowed in civil matters from all final judgments, orders, or decrees of circuit . . . courts . . . to the supreme court, except as otherwise provided." As the State was party to the proceedings below and the orders in question are patently final, it appears to have more than a colorable right to appeal. But by judicial fiat a party bringing an appeal must have been "aggrieved" by the trial court's final order, *In re Guardianship of Ward,* 42 Haw. 60, 65 (1957); *Castle v. Irwin,* 25 Haw. 786, 792 (1921); *Hawaiian Trust Co. v. Holt,* 24 Haw. 212, 215 (1918), for questions capable of judicial resolution are best "presented in an adversary context." *Life of the Land v. Land Use Commission,* 63 Haw. 166, 172, 623 P.2d 431, 438 (1981). And an "aggrieved party," we have held, is one who is affected or prejudiced by the appealable order. *In re Guardianship of Ward, supra; Castle v. Irwin, supra; Hawaiian Trust Co. v. Holt, supra.* The pertinent inquiry then is whether the State was "aggrieved" in some way by the circuit court's orders awarding attorneys' fees.

The State concedes the orders appealed from, on their faces, do not subject it to further liability. It contends, however, that they represent potentials for loss of federal matching funds if allowed to stand.[8] At this juncture we are not prepared to state the threat is nonexistent. "When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states." *Helvering v. Davis,* 301 U.S. 619, 645 (1937). And disputes on "whether federal funds allocated to the States are

---

[8] A substantial portion of the State's expenditures under the AFDC program are subject to reimbursement by the federal government pursuant to 42 U.S.C. § 603. Reimbursement, however, is contingent upon the State's compliance with applicable provisions of the Social Security Act and the regulations promulgated thereunder. The State expresses a fear that its interests in seeking reimbursement of the sums assessed as attorneys' fees would be jeopardized if it is not permitted to contest the propriety of the assessments. It claims, *inter alia,* that the circuit court's orders violated 45 C.F.R. § 234.11(a), which reads:

*Assistance in the form of money payments; . . . .*

(a) Federal financial participation is available in money payments made under a State plan under title I, IV-A, X, XIV, or XVI of the Social Security Act to eligible families and individuals. Money payments are payments in cash, checks, or warrants immediately redeemable at par, made to the grantee or his legal representative with no restrictions imposed by the agency on the use of funds by the individual.

being expended in consonance with the conditions that Congress has attached to their use" are definitively settled by the Supreme Court. *Rosado v. Wyman, supra,* 397 U.S. at 422-23.

We find the State is an "aggrieved party" here since its interests may well be jeopardized if the fees in question were improper. A liberal application of HRS § 641-1(a) and our standing requirement in this instance is consistent with the policy "to permit litigants, where possible to appeal," *Jones v. Dieker, supra,* 39 Haw. at 209, and our prior decisions that have construed statutes and rules on appellate procedure liberally to uphold appeal rights. *See, e.g., Jordan v. Hamada, supra,* 62 Haw. at 451, 616 P.2d at 1373; *Credit Associates of Maui v. Montilliano,* 51 Haw. 325, 329, 460 P.2d 762, 765 (1969); *Madden v. Madden,* 43 Haw. 148, 153 (1959).

### III.

Having disposed of the threshhold question raised by Plaintiffs-appellees, we turn to the issues presented in the State's appeals.

### A.

### 1.

Litigants for whom legal services have been rendered are generally expected "to assume the burden of paying for those services," and prevailing parties ordinarily are not awarded attorneys' fees "in the absence of a statute, agreement or stipulation" authorizing their allowance. *Yokochi v. Yoshimoto,* 44 Haw. 297, 307, 353 P.2d 820, 826 (1960). There are no specific authorizations for fees in the instant situations. But courts have recognized "exceptions to this general rule," and where the efforts "of a member of a class have been instrumental in creating or preserving a fund to the benefit of the entire class," counsel fees have been allowed. *Id.* "The common fund doctrine provides that a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *Vincent v. Hughes Air West, Inc.,* 557 F.2d 759, 769 (9th Cir. 1977). *Cf. Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240 (1975) (an organization acting to vindicate "important statutory rights of all citizens" was not per-

mitted to recover its attorneys' fees from the defendant under the "private attorney general" approach).

The genesis of the "common fund" as a source of attorneys' fees may be traced to century-old landmark decisions of the Supreme Court. In the seminal case, *Trustees v. Greenough,* 105 U.S. 527 (1881), a bondholder, on behalf of himself and other bondholders, pursued litigation to preserve the assets of a fund created to meet interest and sinking fund payments on bonds issued by a railroad company after the fund's trustees had wasted a portion thereof and failed to make the required payments. After eleven years of litigation at his own expense, he succeeded in recapturing some of the wasted assets and securing substantial payments to the bondholders, most of whom accepted the payments. While a residue of the restored trust fund was still under the control of the court, he submitted a claim for reimbursement of his attorneys' fees, which was allowed. The Supreme Court affirmed the allowance of fees, for in its view the complainant was entitled to recover a due portion of the expenses he had incurred from the other bondholders, and "a charge upon the fund . . . [was] the most equitable way of securing such contribution." *Id.* at 532.

The claim against the common fund for counsel fees in *Central Railroad & Banking Co. v. Pettus,* 113 U. S. 116 (1885), was not asserted by the litigant; it was made directly by his attorneys. The direct award of attorneys' fees and the allowance of a lien therefor upon the property brought under the trial court's control in the class action was affirmed by the Supreme Court. And the claim for fees recognized in *Greenough* was effectively transformed into an independent right of attorneys.[9]

The Court subsequently expanded the concepts established by *Greenough* and *Pettus* beyond class actions in *Sprague v. Ticonic Na-*

---

[9] A highly regarded legal scholar has described the significance of *Pettus* as follows:

> The Court seemed to be cheerfully unaware that it had leaped across a gulf. The *Greenough* case three years before had approved the claim of a *client* for contribution to the litigation costs that he had incurred but under the usual rule could not recover from his losing opponents. The *Pettus* case totally transformed this into an independent right of the *lawyer,* reinforced by lien, to an extra reward so that he might share the wealth of strangers.

Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds,* 87 Harv. L. Rev. 1597, 1603 (1974).

*tional Bank,* 307 U.S. 161, 166-67 (1939). By vindicating her rights to a trust, the plaintiff established similar rights in others. But she did not purport to represent them; nor was a common fund established in the traditional sense. Yet the Court found it was within the power of an equity court to award the plaintiff attorneys' fees payable from the trusts established for the benefit of the others.[10]

## 2.

The State does not dispute the efficacy of the common fund doctrine in compensating attorneys whose services benefit the members of a class as well as their own clients in proper situations. But it maintains the common funds here were not under the control, constructive or otherwise, of the circuit court; for they consisted of assistance payments meant for AFDC recipients. HRS § 346-33, it claims, stands as an absolute barrier to the court's diversion of portions of the funds to attorneys for the plaintiff classes. Although a literal application of § 346-33 would support the State's position, we do not read the section to have such effect in the situations before us.

The statutory provision at issue is found in that part of the Hawaii Revised Statutes covering the Department of Social Services and Housing and its functions. The chapter evinces a general pur-

---

[10] The Supreme Court's statement in this regard was:

That the party in a situation like the present neither purported to sue for a class nor formally established by litigation a fund available to the class, does not seem to be a differentiating factor so far as it affects the source of the recognized power of equity to grant reimbursements of the kind for which the petitioner in this case appealed to the chancellor's discretion. Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation. Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation — the ab:ence of an avowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree — hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation. As in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility.

Sprague v. Ticonic National Bank, *supra,* 307 U.S. at 166-67 (footnote omitted).

pose to further the social welfare, and a particular provision, HRS § 346-14, mandates State cooperation with the federal government "in carrying out the purposes of the Social Security Act, and in other matters of mutual concern pertaining to public welfare, public assistance, and child welfare services."[11] That AFDC is a program established by the Social Security Act has been noted, as has its primary purpose to aid "needy dependent children and the parents or relatives who live with and care for them." *Shea v. Vialpando, supra,* 416 U.S. at 253.

HRS § 346-33 provides in broad terms that assistance payments are inalienable; its obvious intent is to prevent a diminution, disposal, or divestiture of public assistance payments prior to their receipt by intended recipients. Strictly construed, it clearly precludes the allowance of attorneys' fees from common funds consisting of AFDC benefits. But to read it as prohibiting awards of fees here would hardly be consonant with its purpose of ensuring that public assistance payments reach recipients in amounts specified by law.

The existence of the common funds and the right of AFDC recipients to share in the proceeds of the class actions are attributable to the attorneys for the plaintiff classes. Without the lawyers' efforts, class members would not have received benefits in legally prescribed amounts. The work of the attorneys thus served a purpose entirely consistent with the policies and purposes of the Social Security Act and HRS Chapter 346. It would be illogical to apply a provision in the latter which is designed to prevent the diminution of assistance payments to impede the receipt of fees earned by attorneys responsible for the enhancement of assistance payments.

---

[11] HRS § 346-14(6) reads:
Duties generally. Except as otherwise provided by law, the department of social services and housing shall:
. . . .
(6) Cooperate with the federal government in carrying out the purposes of the Social Security Act, and in other matters of mutual concern pertaining to public welfare, public assistance, and child welfare services, including the making of such reports, the adoption of such methods of administration and the making of such rules and regulations as are found by the federal government, or any properly constituted authority thereunder, to be necessary or desirable for the efficient operation of the plans for such public welfare, assistance, and child welfare services, or as may be necessary or desirable for the receipt of financial assistance from the federal government.

Where the letter of the law has produced a harsh result contrary to its intendment, we have not hesitated to eschew a strict reading and to seek meaning from its policy. *Hawaii Carpenters' Trust Funds v. Aloe Development Corp.,* 63 Haw. 566, 574, 633 P.2d 1106, 1111 (1981). For the Supreme Court teaches us:

> The policy as well as the letter of the law is a guide to decision. Resort to the policy of a law may be had to ameliorate its seeming harshness or to qualify its apparent absolutes as *Holy Trinity Church v. United States,* 143 U.S. 457 illustrates. The process of interpretation also misses its high function if a strict reading of a law results in the emasculation or deletion of a provision which a less literal reading would preserve.

*Markham v. Cabell,* 326 U.S. 404, 409 (1945).[12] Finding a "less literal reading" would serve the purpose and policy of the law, we do not read HRS § 346-33 as inhibiting the award of fees from common funds consisting of AFDC benefits in the situations at hand. And as the permissible use of class actions, formerly limited to suits in equity, has been extended to all civil litigation in the circuit courts by Rule 23 of the Hawaii Rules of Civil Procedure, *Life of the Land v. Land Use Commission, supra,* 63 Haw. at 179, 623 P.2d at 442, the circuit court undoubtedly was vested with power to allow the fees. Thus we proceed to the question on the sums allowed.

### B.

#### 1.

We formally acknowledged the class action's vast potential for lending speed and efficiency to the administration of justice when its use in all civil litigation in the circuit courts was authorized. But we

---

[12] The relevant statement of the Court in Holy Trinity Church v. United States reads as follows:

> It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.

143 U.S. 457, 459 (1892).

recently issued a caveat that one of the latchkeys to its actual use was fairness to absentee class members. *Id.* Fairness to the class must be watchwords in a subsequent award of counsel fees too, for the class action's capacity to promote justice "is attended with equally great potential of unreasonable charges for attorneys' fees and expenses and of improper solicitation of legal representation."[13] *Manual for Complex Litigation* 65 (1977).

The total sum in the common fund in Montalvo v. Chang was approximately $103,000. Claiming more than ninety hours of work had been performed on behalf of the plaintiff class, its attorneys sought a fee award amounting to fifteen percent of the fund. They were allowed fourteen and two-tenths percent of the recovery in fees and costs, both accrued and anticipated. The costs, however, constituted a minor portion of the awarded sum. The lawyers for the plaintiff classes in Arbas v. Chang and Von Hiram v. Chang claimed one hundred seventy-eight and one-half hours had been spent on behalf of class members and requested twenty percent of common funds totalling approximately $184,000 for their services. The circuit court allowed them twelve and one-tenth percent of the recovered sums as their fees.[14] What was reasonable and fair in the court's opinion was established in all cases without evidentiary hearings. Moreover, the actual basis therefor is not articulated, and we

---

[13] The footnote at this point in the text of the *Manual for Complex Litigation* contains a quotation from a decision of the Court of Appeals for the Second Circuit reading:

"Few subjects associated with the class action device have generated as much critical commentary in recent years as the matter of attorneys' fees. *See, e.g.,* Illinois v. Harper & Row Publishers, Inc., 55 F.R.D. 221 (N.D. Ill. 1972); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1803 (1976 Supp.); Manual for Complex and Multidistrict Litigation § 1.47 (1973 rev. ed.); Comment, Attorneys' Fees in Individual and Class Action Antitrust Litigation, 60 Cal. L. Rev. 1656 (1972); Handler, The Shift from Substance to Procedural Innovations in Antitrust Suits — The Twenty-Third Annual Antitrust Review, 71 Colum. L. Rev. 1, 9-10 (1971). As Judge Decker has wryly put it, the lucrative fees involved in recent class actions may evoke public acceptance of an Italian proverb, 'A lawsuit is a fruit tree planted in a lawyer's garden.' Illinois v. Harper & Row, *supra*, 55 F.R.D. at 224." Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc., 481 F.2d 1045, 1049, 1050 (2d Cir. 1973), cert. denied, 414 U.S. 1092, 94 S. Ct. 722, 38 L. Ed.2d 549 (1973).

[14] On the basis of time purportedly spent, the attorneys in all three cases were compensated at well over a hundred dollars per hour. In Arbas v. Chang and Von Hiram v. Chang, the hourly rates of compensation were nearly $125. While the awarded sum in Montalvo v. Chang included costs, we have no doubt that the hourly rate of compensation there was at least $125.

are unable to engage in a meaningful review of fairness.

We assume for present purposes that the court followed the general guidelines for determining reasonable attorneys' fees set forth in *Sharp v. Hui Wahine, Inc.*, 49 Haw. 241, 244-45, 413 P.2d 242, 245-46, *rehearing denied*, 49 Haw. 257, 414 P.2d 82 (1966). Yet these guides in our opinion, were not precise enough for the particular determinations. Rule 23, H.R.C.P., compels the circuit court to assume the role of a "protector of the rights of absent class members," *Manual for Complex Litigation, supra,* at 61,[15] and demands more stringent standards.

Our views in this regard are far from unique, for courts dealing with the problem have characteristically adopted exacting, though not necessarily similar, standards to govern the allowance of fees. *See Manual for Complex Litigation, supra,* at 66-68; 3 H. Newberg, *Class Actions* §§ 6920-22c, at 1132-43 (1977). Among the noteworthy endeavors to infuse a desired fairness into the relevant awards have been the efforts of the Court of Appeals for the Third Circuit.

In *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973) ("Lindy I"), a multi-district antitrust class suit, the appellate court vacated fee orders which had been entered without evidentiary hearings, purportedly on the trial court's consideration of four factors: "the percentage of a claimant's recovery awarded as attorneys' fees in other cases, the amount of the recovery from which fees were being awarded, the amount the attorneys received from their clients under private agreements, and the time spent . . . 'in connection with this litigation.' " *Id.* at 166. The Court of Appeals found "[t]he mere listing of four factors for consideration . . . makes meaningful review difficult and gives little guidance to attorneys and claimants," *id.* at 166-67, and then detailed its four-step process for ensuring fair and reasonable fees.

The procedure described in "Lindy I" commences with the trial court's ascertainment of the actual services rendered to the class. In essence, the initial inquiry is "how many hours were spent in what

---

[15] The actual reference in the *Manual* is to Rule 23(e) and its proscription of dismissals or compromises of class actions without court approval. But we have stated that the class action's objectives "are not procurable at the expense of fairness to absentees," Life of the Land v. Land Use Commission, *supra,* 63 Haw. at 179, 623 P.2d at 442, and believe the circuit court has a definite obligation to protect the interests of absent class members at all stages of litigation.

manner by which attorneys." *Id.* at 167. The determination of time spent in performing services "within appropriately specific categories," *id.*, is followed by an estimate of its worth. "The value of an attorney's time generally is reflected in his normal billing rate." *Id.* But it may be "necessary to use several different rates for the different attorneys" and the reasonable rate of compensation may differ "for different activities." *Id.* And when the hourly rate reached through the foregoing analysis is applied to the actual hours worked, a "reasonably objective basis for valuing an attorney's services" is derived. *Id.* The inquiry, however, does not end here, for other factors must be considered. The product of the first and second steps nevertheless serves as the "lodestar" of the ultimate fee award. *Id.* at 168.

The first of the factors to be considered for possible adjustment of the "lodestar" determination is "the contingent nature of success," a factor which may be of special significance where "the attorney has no private agreement that guarantees payment even if no recovery is obtained." *Id.* The second additional factor to be examined "is the extent, if any, to which the quality of an attorney's work mandates increasing or decreasing" the "lodestar" figure. *Id.* If the court decides an adjustment is justified on this basis, it "should set forth as specifically as possible the facts that support . . . [its] conclusion." *Id.* at 169.

The phase covering the examination of possible adjustment factors was subsequently refined through amplification in *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir. 1976) ("Lindy II").[16] Where "Lindy I" spoke in general terms, "Lindy II" was explicit. In discussing "the contingent nature of success" in the latter, the Court of Appeals said "the . . . [trial] court should appraise the professional burden undertaken — that is, the probability or likelihood of success, viewed at the time of filing suit," and the "lodestar" figure is subject to being increased after an evaluation of the plaintiff's burden, the risks assumed in developing the case, and the delay in receipt of payment for services rendered.

---

[16] "Lindy II" is the decision of the Court of Appeals for the Third Circuit on the appeal from the fee awards made by the district court after the appellate court vacated the original fee awards and remanded the case pursuant to its opinion in "Lindy I".

*Id.* at 117.[17] With respect to the second adjustment factor, "the quality of an attorney's work," "Lindy II" rendered it clear that this is not a reference to an attorney's "experience, knowledge and legal talent"; the foregoing "aspect of 'quality' is reflected in the 'lodestar' and should not be utilized to augment or diminish the basic award under the rubric of 'quality of an attorney's work.' " *Id.* The pertinent phrase, as the court explained, describes "the manner in which counsel discharged his or her professional responsibilities," *id.,* and the relevant considerations include "[t]he result obtained by verdict or settlement" and "[a]n evaluation of the professional methods utilized in processing the case." *Id.* at 118.[18]

---

[17] The full statement in this regard reads:
The court may increase the amount established in the computation of the "lodestar" as a reasonable fee on the basis of a careful evaluation of the following factors:

1. Analysis of plaintiff's burden. Subsumed in this category are the following considerations: (a) the complexity of the case, — legally and factually; (b) the probability of defendant's liability, — whether it is clear or dubious; whether it has been previously suggested by other civil or criminal proceedings; whether it is asserted under existing case law or statutory interpretation, or is advanced as a novel theory; (c) an evaluation of damages, — whether the claims would be difficult or easy to prove.

2. Risks assumed in developing the case. This category subsumes consideration of: (a) the number of hours of labor risked without guarantee of remuneration; (b) the amount of out-of-pocket expenses advanced for processing motions, taking depositions, etc.; (c) the development of prior expertise in the particular type of litigation; recognizing that counsel sometimes develop, without compensation, special legal skills which may assist the court in efficient conduct of the litigation, or which may aid the court in articulating legal precepts and implementing sound public policy.

3. The delay in receipt of payment for services rendered.
"Lindy II", *supra,* 540 F.2d at 117.

[18] The full statement in this regard reads:
In determining whether to adjust the "lodestar" for quality work or not, the district court may consider, *inter alia:*

1. The result obtained by verdict or settlement, evaluated in terms of (a) the potential money damages available to the class member, *i.e.,* a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit — monetary or non-monetary — conferred on the class, *i.e.,* permitting the court "to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested. . . ." *Merola II, supra,* 515 F.2d at 168.

2. An evaluation of the professional methods utilized in processing the case, — rewarding the use of efficient methods to expedite the case and penalizing the use of methods the predominant purpose of which was to delay or obstruct the proceedings.
540 F.2d at 118.

The determination of "the total reasonable value of an attorney's services in securing recovery of a fund," "Lindy I", *supra,* 487 F.2d at 109, is followed by a decision on how the burden of payment is to be shared among the class. Generally, claimants are assessed fees in amounts proportionate to their share of the common fund. Moreover, in "Lindy II", "[p]rivate arrangements individual members of the class may have with counsel . . . [were deemed] simply irrelevant," 540 F.2d at 120.

2.

The method of calculation favored by the Third Circuit "has now been rather widely adopted." *Manual for Complex Litigation, supra,* at 68; *see also Grunin v. International House of Pancakes,* 513 F.2d 114, 128 (8th Cir.), *cert. denied,* 423 U.S. 864 (1975); *Brandenburger v. Thompson,* 494 F.2d 885, 890 n.7 (9th Cir. 1974). We are convinced from a review of the case law in the realm of our concern that this wide acceptance is justified; the prototype offered by "Lindy I" and "Lindy II" remains among the more rational and comprehensive computational modes devised thus far. We are mindful that the "Lindy" standards have been criticized as overly rigid by those who are still partial to the more traditional and flexible approach of the Court of Appeals of the Second Circuit in *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., supra,* 481 F.2d at 1051.[19] *See* 3 H. Newberg, *supra.* And while we agree the ultimate criterion is "only that the final award be reasonable under the circumstances of the case," *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., supra,* we nevertheless believe a required conformance to a known process is more likely to produce the desired result than a mere suggestion of a procedure and the reiteration of an objective. *See* note 19 *supra.* Thus, the award of

---

[19] The Second Circuit's comment on a resort to precise standards in fixing class action attorneys' fees reads in part:

But, as a number of courts have recently recognized, factors such as those related above, while helpful, can serve only as guides, not as precise yardsticks. . . . In the end, no mathematical formula, or precise weighing of specific factors is necessary, nor even desirable. In fact, there is no requirement that each of the listed criteria be taken into account, only that the final award be reasonable under the circumstances of the case.

481 F.2d at 1051 (citation omitted).

attorneys' fees from common funds created by judgments in class actions should henceforth follow the guides enunciated in "Lindy I" and refined by "Lindy II".[20]

We earlier observed the orders in question were entered without evidentiary hearings.[21] Hence, the information from which proper "lodestar" determinations could have been made was definitely lacking. The record further manifests no consideration of either "the contingent nature of success" or "the quality of an attorney's work". Yet fees in excess of one hundred dollars per hour were allowed. We doubt that a strong case for an upward adjustment of the "lodestar" could have been made, since the judgments creating the funds were premised on prior federal court judgments.[22] Though there may have been circumstances justifying the high fee awards, the facts are not disclosed by the record.

The orders awarding attorneys' fees are vacated, and the cases are remanded for redeterminations of the awards.

*Charleen M. Aina (Dewey H. Kim, Jr.,* on opening & reply briefs in Case Nos. 7696 & 7697), Deputies Attorney General for defendants-appellants.

---

[20] In adopting the foregoing standards, we, like the Third Circuit,

> do not intend that a . . . [trial] court, in setting an attorneys' fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It was not and is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief. Once the . . . [trial] court determines the reasonable hourly rates to be applied, for example, it need not conduct a minute evaluation of each phase or category of counsel's work.

"Lindy II", *supra,* 540 F.2d at 116.

But the trial court should set forth the actual bases for the "lodestar" determination and "[i]f . . . the court is persuaded that an increase or decrease in the 'lodestar' is warranted, it should identify those factors supporting its conclusions, state the specific amount by which the basic fee should be altered due to the quality of work, and give a brief statement of reasons therefor." *Id.* at 118.

[21] The necessity of evidentiary hearings to develop information for the formulation of proper awards is implicit in the "Lindy" guidelines.

[22] We are not passing judgment on whether the "lodestar" was subject to adjustment here. However, the record presented to us manifests no basis for upward adjustment. If anything, the possible adjustment factors were more negative than positive. We are referring, of course, to factors such as the virtual certainty of successful results from the inception of the suits, the stipulated judgments, and the collectability of the judgments due to the fact that the State was the defendant.

*William S. Hunt (Paul Alston* on answering brief in Case No. 7289; *Paul, Johnson & Alston,* of counsel) for plaintiffs-appellees.