141 P.3d 1014

Ann C. KEMP, Individually and as Next Friend for Lindsay Agnes Kemp, on Behalf of Herself and Others Similarly Situated, Plaintiff–Appellee/Cross–Appellant

v.

STATE OF HAWAI'I CHILD SUPPORT ENFORCEMENT AGENCY; State of Hawai'i, Defendants–Appellants/Cross–Appellees.

No. 26084.

Supreme Court of Hawai'i.

Aug. 21, 2006.

Dorothy Sellers, Adina L. Cunningham, and Kimberly Tsumoto, Deputy Attorneys General, On the briefs, for Defendants–Appellants/Cross–Appellees.

Francis T. O'Brien, and Christopher D. Ferrara, Honolulu, on the briefs, for Plaintiffs–Appellees/Cross–Appellants.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

Defendants–Appellants/Cross–Appellees State of Hawai'i Child Support Enforcement Agency and State of Hawai'i (CSEA or collectively, CSEA as the case may be) appeal from the Final Judgment of the circuit court of the first circuit [1] (the court), filed July 16, 2003, determining that (1) the CSEA has a fiduciary duty to disburse child support payments subject to Hawai'i Revised Statutes (HRS) § 571–52.2(e) (Supp.2005) [2] within two days of receiving notification that a negotiable instrument has cleared or within two days of receiving a cash payment; (2) the CSEA breached its fiduciary duty to obligees whose child support payments were held in the "uncashed check" or "bad address" accounts; (3) the named Plaintiff, Ann C. Kemp (Kemp), was an adequate representative of the class; (4) a common fund was

---

1. The Honorable Sabrina S. McKenna presided.

2. Hawai'i Revised Statutes (HRS) § 571–52.2 (Supp.2005), entitled "Automatic assignment by court or administrative order of future income for payment of child support," provides in relevant part:

> (e) An employer receiving an assignment order shall send the amounts withheld to the designated obligee or, if requested, to this State's child support enforcement agency within five working days after the obligor is paid. The employer shall begin withholding no later than the first pay period occurring within seven business days following the date a copy of the order is mailed to the employer. As used in this subsection, the term "business day" means a day on which the employer's office is open for regular business. The employer shall withhold funds as directed in the order, except that when an employer receives an income withholding order issued by another state, the employer shall apply the income withholding law of the state of the obligor's principal place of employment in determining:
> (1) The employer's fee for processing an income assignment order;
> (2) The maximum amount permitted to be withheld from the obligor's income under section 303(b) of the Consumer Credit Protection Act (15 U.S.C. § 1673(b));
> (3) The time periods within which the employer must implement the income withholding order and forward the child support payment;
> (4) The priorities for withholding and allocating income withheld for multiple child support obligees; and
> (5) Any withholding terms or conditions not specified in the order.
> An employer who complies with an income assignment order that is regular on its face shall not be subject to civil liability to any person or agency for conduct in compliance with the order.
> An employer who is required to withhold amounts from the income of more than one obligor may remit a sum total of the amounts in one check, with a listing of the amounts applicable to each obligor.
> Within two working days after receipt of the amounts withheld by the employer, the child support enforcement agency shall disburse those amounts to the obligee for the benefit of the child, except that the child support enforcement agency may delay the distribution of collections toward arrearages until the resolution of any timely request for a hearing with respect to such arrearages.

created for the purposes of paying the attorneys' fees and costs of Kemp, Individually and as Next Friend for Lindsay Agnes Kemp, on Behalf of Herself and Others Similarly Situated [collectively, Plaintiffs]; and (5) attorneys' fees and costs be awarded to Plaintiffs. We hold that, (a) as to items (1) to (4), the obligees included in the "uncashed check" and "bad address" categories were not adequately represented by Kemp, therefore, any judgment regarding their claims against the CSEA was incorrect; and (b) as to item (5), because Plaintiffs are not the prevailing party, the award of attorneys' fees and costs was also incorrect. Accordingly, we vacate the court's Final Judgment in part to the extent that it determined that (1) the CSEA breached its fiduciary duty to obligees in the "uncashed check" and "bad address" categories; (2) Kemp was an adequate representative of the Class; and (3) Plaintiffs were entitled to attorneys' fees and costs, and remand with instructions to dismiss as to those matters.[3]

Plaintiffs cross-appeal from the Final Judgment challenging the findings contained in the Summary Judgment Order, filed July 14, 2000, that (1) Plaintiffs had no cognizable property interest in any interest earned on delinquent child support disbursements and (2) as such, Plaintiffs were not entitled to an accounting of any interest earned on delinquent disbursements. Plaintiffs also challenge the court's conclusion in the Final Judgment that the CSEA does not have implied contractual duties to obligees. We hold

that (1) the court did not err in granting CSEA summary judgment on the grounds that Plaintiffs do not have a property right on accrued interest for child support disbursements made outside the statutory two-day period, (2) Plaintiffs are not entitled to an accounting of the accrued interest, and (3) the CSEA does not have implied contractual duties to obligees. Accordingly, we affirm those parts of the Summary Judgment Order and Final Judgment from which the Plaintiffs cross-appeal.

## I.

## A.

A brief history of the development and purpose of the CSEA is useful. In 1975, Congress created a federal-state cooperative program of child support enforcement under Title IV–D of the Social Security Act. The Auditor, State of Hawai'i, *Follow Up Management Audit of the Child Support Enforcement Agency, A Report to the Governor and the Legislature of the State of Hawai'i*, Rep. No. 00–06 at 1 (February 2000) [hereinafter, 2000 Audit]. The CSEA was established pursuant to HRS chapter 576D and was originally placed under the administration of the Department of Social Services and Housing (now Department of Human Services). *Id.* In July 1987, the CSEA was made a division of the Attorney General's Office. *Id.* The CSEA is charged with enforcing child support orders.[4] The CSEA collects payments from non-custodial parents and disburses the

---

3. We affirm the court's July 16, 2003 Final Judgment insofar as it determined that (1) named Plaintiff, Ann C. Kemp, has a property interest in child support payments collected on her behalf by Defendant–Appellant/Cross Appellee State of Hawai'i Child Support Enforcement Agency (CSEA), (2) the CSEA is a fiduciary for the purpose of disbursing child support payments, and (3) the CSEA has a fiduciary duty to disburse child support payments within two working days of receiving notification that a negotiable instrument has cleared, or within two working days of receiving cash.

As discussed with respect to Plaintiffs' cross-appeal, we also affirm the court's (1) grant of summary judgment with respect to (a) accrued interest for child support disbursements, and (b) the determination that Plaintiffs are not entitled to an accounting of accrued interest, as well as (2) the court's ruling in the Final Judgment that the CSEA does not have implied contractual duties to obligees.

4. The 2000 Audit defines child support in the following manner:

> "Child Support" means payment for the necessary support and maintenance of a dependent child as required by law. Typically, a court or administrative agency issues an order establishing that a parent who does not have [physical] custody of the child (the noncustodial parent) owes child support to or on behalf of a child, or to the parent, guardian, or other person having custody of the child (the custodial parent). In some cases, the payment goes directly to a government agency as "reimbursement" ' for welfare benefits received by the child.

The Auditor, State of Hawai'i, *Follow Up Management Audit of the Child Support Enforcement Agency, A Report to the Governor and the Legislature of the State of Hawai'i*, Rep. No. 00–06 at 1 (February 2000).

collected amounts to state and federal government agencies and to custodial parents. The program has two primary purposes: (1) to recover public assistance benefits paid by the government for dependent children from non-custodial parents; and (2) to help custodial parents who are not receiving public assistance remain self-sufficient by assisting them in the collection of child support. *Id.* at 2.

The CSEA must receive and disburse child support payments when required to do so by a child support order. *Id.* The agency locates and contacts non-custodial parents who fail to comply with child support orders. *Id.*

5. 42 U.S.C. § 652(d)(3)(A)(iii) (2000), entitled "Child Support and Establishment of Paternity; Duties of Secretary; Child support management information system," provides in pertinent part, as follows:

> (3) The Secretary [of Health and Human Services] may waive any requirement of paragraph (1) [(requiring approval of the automated data processing system)] or any condition specified under section 654(16) of this title [(providing guidelines for automated system)] and shall waive the single statewide system requirement under sections 654(16) and 654a of this title with respect to a state if—
>
> (A) the State demonstrates to the satisfaction of the Secretary that the State has or can develop an alternative system or systems that enable the State—
>
> . . . .
>
> (iii) to *substantially comply* with the requirements of this part[.]
> (Emphasis added.)

6. 45 C.F.R. § 308.2(b) (2004), entitled "Required program compliance criteria; Establishment of paternity and support order," provides in pertinent part:

> (b) ... The State must have and use procedures required in this paragraph in at least 75 percent of the cases reviewed.
> (1) If an order for support is required and established during the review period, the case meets the requirements, notwithstanding the timeframes for: establishment of cases as specified in Sec. 303.2(b) of this chapter; provision of services in interstate IV–D cases per § 303.7(a), (b), (c)(4) through (6), and (c)(8) and (9) of this chapter; and location and support order establishment under §§ 303.3(b)(3) and (5), and 303.4(d) of this chapter.
> (2) If an order was required, but not established during the review period, the State must determine the last required action and determine whether the action was taken within the appropriate timeframe.

If necessary, the agency uses statutory powers to enforce compliance, including submission to genetic testing to establish paternity, seizure of income tax returns, forfeiture of property, denial of passports, suspension of licenses, and freezing of financial assets. *Id.*

### B.

Pursuant to 42 U.S.C. § 652 (2000)[5] the federal government monitors the CSEA for "substantial compliance" with the statutes and regulations governing the disbursement of child support payments, meaning that 75%[6] of payments be made within the various time frames established under 45 C.F.R. § 302.32 (2004).[7]

7. 45 C.F.R. § 302.32(b) (2004), entitled "Collection and disbursement of support payments by the IV–D Agency," provides in pertinent part:

> (b) Timeframes for disbursement of support payments by State disbursement unit (SDU) under section 454B of the [Social Security] Act.
> (1) In interstate IV–D cases, amounts collected by the responding State on behalf of the initiating State must be forwarded to the initiating State *within 2 business days* of the date of receipt by the SDU in the responding State, in accordance with § 303.7(c)(7)(iv).
> (2) Amounts collected by the IV–D agency on behalf of recipients of aid under the State's title IV–A or IV–E plan for whom an assignment under sections 408(a)(3) or 471(a)(17) of the Act is effective shall be disbursed by the SDU within the following timeframes:
> (i) Except as specified under paragraph (b)(2)(iv) of this section, if the SDU sends payment to the family (other than payments sent to the family from the State share of assigned support collections), the SDU must send these payments *within 2 business days of the end of the month* in which the payment was received by the SDU. Any payment passed through to the family from the State share of assigned support collections must be sent to the family *within 2 business days* of the date of receipt by the SDU.
> (ii) Except as specified under paragraph (b)(2)(iv) of this section, when the SDU sends collections to the family for the month after the month the family becomes ineligible for title IV–A, the SDU must send collections to the family *within 2 business days* of the date of receipt by the SDU.
> (iii) Except as specified under paragraph (b)(2)(iv) of this section, when the SDU sends collections to the IV–E foster care agency under § 302.52(b)(2) and (4) of this part, the SDU must send collections to the IV–E agency *within 15 business days of the end of the month* in which the support was received by the SDU.

On March 30, 1999, Michael Meaney (Meaney), then administrator of the CSEA, filed a report with the federal government stating that the CSEA was in "substantial compliance" for the period of July 1, 1998 through December 31, 1998. A preliminary report for the first quarter of 1999 indicated that the CSEA distributed 91.4%[8] of payments within the time limits prescribed by law, well above the federal government's substantial compliance standard.

In recent years, there have been many complaints about CSEA, primarily concerning alleged shortcomings in processing child support payments and poor agency response to clients' problems. Margery Bronster, then-Attorney General, and Meaney testified before the State Senate Ways and Means Committee that the CSEA's voice response unit averaged 2,500 calls per day since July 1998, when the agency's new automated system was implemented. One thousand callers per day were served by the automated system, but the remaining 1,500 requested to speak to a live operator. The CSEA estimated that the average call required 15 minutes to complete. The volume of calls overwhelmed the CSEA staff. The apparent lack of customer service was compounded by the fact that the ratio of cases to caseworker in Hawai'i was 1,000 cases per caseworker, although industry standards dictate that a ratio of 500 cases per caseworker is unacceptably high.

Alton Kagawa (Kagawa), the chief accountant of the CSEA from September 1986 to September 1998, explained that the KEIKI system was designed to meet requirements for the timely and accurate processing of payments and disbursements. It was a significant change from the previous system, KFRI, which was designed primarily for bookkeeping in 1984, but was used for additional purposes as well. With KEIKI, the CSEA had a fully automated system that integrated financial, enforcement, paternity and order establishment, and modification services.

Agency officials asserted that the rush to complete the KEIKI system may have had unanticipated outcomes, resulting in an overwhelming need for assistance among agency clients. The 2000 Audit noted that, in Report No. 98–12, *Audit of the Implementation of the Child Support Enforcement Agency's Information System*, the Auditor "found fault with the overly ambitious initial scope of the information system project, inadequate technical resources assigned to the project, and ... [recommended] completing a support and maintenance plan." 2000 Audit at 8.

In 1999, the Office of the Auditor of the State of Hawai'i (the Auditor) conducted a follow up management audit of the agency.[9]

---

(iv) Collections as a result of Federal income tax refund offset paid to the family under section 457(a)(2)(iv) of the Act or distributed in title IV–E foster care cases under § 302.52(b)(4) of this part, must be sent to the IV–A family or IV–E agency, as appropriate, *within 30 calendar days* of the date of initial receipt by the IV–D agency, unless State law requires a post-offset appeal process and an appeal is filed timely, in which case the SDU must send any payment to the IV–A family or IV–E agency within 15 calendar days of the date the appeal is resolved.

(3)(i) Except as provided under paragraph (b)(3)(ii) of this section, amounts collected on behalf of individuals receiving services under § 302.33 of this part shall be disbursed by the SDU pursuant to section 457 of the Act, *within 2 business days* of receipt by the SDU.

(ii) Collections due the family under section 457(a)(2)(iv) of the Act as a result of Federal income tax refund offset must be sent to the family *within 30 calendar days* of the date of initial receipt in the IV–D agency, except:

(A) If State law requires a post-offset appeal process and an appeal is timely filed, in which case the SDU must send any payment to the family *within 15 calendar days* of the date the appeal is resolved; or

(B) As provided in § 303.72(h)(5) of this chapter.

(Emphases added.)

8. According to Michael Meaney, the statistics reported to the federal government regarding timeliness of payments exclude "unidentified or held payments." Alton Kagawa, chief accountant for the CSEA from 1986 to 1998, explained that federal law allows the CSEA to exclude unidentified payments, properly held payments, and non-Title IV–D cases from the reports on timely disbursement of child support payments.

9. Management audits "examine the effectiveness of programs or the efficiency of agencies or both." The Auditor, State of Hawai'i *Follow Up Management Audit of the Child Support Enforcement Agency, A Report to the Governor and the Legislature of the State of Hawai'i*, Rep. No. 00–06 at preface (Feb.2000). Moreover, "[t]hese audits are also called program audits, when they focus on whether programs are attaining the objectives and results expected of them, and op-

In the 2000 Audit, the Auditor noted that the agency has failed to address longstanding weaknesses in its financial management and has not implemented recommendations of previous audits pertaining to financial management. Bank accounts are not reconciled and accurately reported and accounting for interest earnings is improper. . . . The deficiencies include (a) inadequate data cleanup, training, and maintenance for the agency's automated systems; (b) weak personnel management, including failure to implement an agency reorganization; and (c) the inability to respond effectively to the needs of its clients (custodial and noncustodial parents).

*Id.* at 11. The Auditor further found that " 'Bad data'—erroneous information stored in agency computer records—lead to such problems as KEIKI . . . generating duplicate records or erroneously initiating or suspending activities, contributing to client frustration and complaints." *Id.* In addition to these problems, the Auditor discovered that "[t]he agency may have improperly used interest earnings for purposes not authorized by law and has commingled state and federal funds in violation of legislative intent and accounting principles." *Id.* at 15.

The financial management of CSEA has improved significantly since the publication of the 2000 Audit. Many of the recommendations of the Auditor, such as monthly bank reconciliations, have been adopted. Also, CSEA hired a Certified Public Accountant, Sherry Wang (Wang), as its Chief Financial Officer, which the Auditor had been recommending since 1992. *Id.* at 8.

## II.

## A.

On May 19, 1998, in FC–D No. 98–1524, Kemp was divorced from her husband. Under the divorce decree, Kemp was awarded custody of their minor child. As reflected on the May 19, 1998 Order of Income Assignment, Kemp was awarded child support in the amount of $380 bi-weekly. On May 20, 1998, Kemp's attorney sent copies of the Order of Income Assignment to the Department of Finance Payroll Office of the husband's employer and to the CSEA. The payments were deducted from the husband's paychecks starting on May 29, 1998. Despite numerous inquiries to CSEA, the agency did not issue checks to Kemp until July 20, 1998 and July 21, 1998, as a result of "glitches" caused by the transfer to the new KEIKI system. Kemp testified that all of her payments since then have been timely.

## B.

On August 28, 1998, Kemp filed suit against the CSEA on behalf of herself and all others similarly situated. The complaint contained six counts: (1) Count I, for declaratory relief; (2) Count II, for injunctive relief; (3) Count III, for damages caused by breach of implied contract; (4) Count IV, for damages caused by breach of fiduciary duty; (5) Count V, for an accounting and information; and (6) Count VI, for the creation of a common fund.

On February 5, 1999, the court [10] designated the suit as complex litigation. On May 17, 1999, the court [11] entered an "Order Certifying Class and Class Issues" (Class Order) providing that the "case shall proceed as a class action under Hawaii Rules of Civil Procedure [(HRCP)] Rule 23(b)(2) [12] only." The Class Order defined the Plaintiff Class as follows:

All Persons who, within two years prior to the filing of the Complaint herein, were entitled to receive child support payments through the CSEA of the State of Hawai'i;

---

erations audits, when they examine how well agencies are organized and managed and how efficiently they acquire and utilize resources." *Id.*

**10.** The Honorable Kevin S.C. Chang presided.

**11.** The Honorable Gail C. Nakatani presided.

**12.** Hawai'i Rules of Civil Procedure (HRCP) Rule 23(b)(2) (2006), entitled "Class actions maintainable," provides in relevant part:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]

and all Persons who, more than two years before the filing of the Complaint herein, were subject to a legal disability, were entitled to receive child support payments through the CSEA of the State of Hawai'i, and whose legal disability ceased one year prior to the filing of the Complaint; and all Persons who are hereafter entitled to receive child support payments through the CSEA of the State of Hawai'i, and *who did not or will not receive their child support payments, without legal justification,* within the time limits set forth in the Hawai'i Revised Statutes, including Persons for whose benefit child support payments are tendered.

(Emphasis added.)

The court determined that the common questions of fact and law included, but were not limited to (1) whether Defendants violated any law by disbursing child support payments after the time periods set by law; (2) whether Plaintiffs are entitled to any interest earned on child support payments held in the interest-bearing account; (3) whether retention of interest earned on child support payments after the expiration of the time period set by law constitutes a taking of property without due process of law; and (4) whether Plaintiffs are entitled to an injunction requiring the CSEA to comply with the time periods set by law.

On June 7, 1999, the case was assigned to Judge McKenna. On April 28, 2000, Kemp filed a Motion for Partial Summary Judgment seeking: (1) a ruling that Plaintiffs have property rights in the interest earned on child support payments that are not paid within the time limits prescribed by law; (2) a ruling that the retention of the interest on delinquent payments by the CSEA or the State of Hawai'i is a taking of private property for public use without just compensation within the meaning of the United States Constitution and the Hawai'i Constitution; and (3) an order that the CSEA and/or the State of Hawai'i must provide Plaintiffs with a full and complete accounting of the funds that they have had in their possession.

On April 28, 2000, CSEA filed a Motion for Summary Judgment, asserting various defenses against Plaintiffs' claims. Defendants asserted that the suit was barred by sovereign immunity; that the action was barred because HRS § 576D–10 (Supp.2005) [13] "earmarks" any interest earned for other purposes; that there was no statutory basis for Plaintiffs' claim to interest earned; that state statutes specifically provide that Plaintiffs were not entitled to interest prior to judgment being obtained; that Plaintiffs did not have a property interest in any interest that may have accrued on child support payments; and that the amount of money, in the form of interest, was *de minimis* and did not rise to a constitutionally protected property right.

On July 14, 2000, the court entered its Summary Judgment Order (the Summary Judgment Order) granting CSEA partial summary judgment. In the Summary Judgment Order, the court concluded, *inter alia,* that the members of the Plaintiff Class did not have a cognizable property interest in the interest generated by child support payments held by CSEA in an interest-bearing account that were disbursed delinquently. However, the court did conclude that the Plaintiffs had a protected property interest in the corpus, or principal, of the child support payments and, accordingly, ordered a future accounting regarding the corpus of child support payments that remained unpaid within the prescribed time periods as of July 31, 2000.[14]

---

13. HRS § 576D–10 (Supp.2005), entitled "Collection and disbursal of child support; direct payment exception," provides in pertinent part that the interest realized from the special interest bearing account for child support payments be used for "related costs of the maintenance and operation of the account," and that the balance be "deposited into the state treasury to the credit of the general fund." The statute was amended in 1999 to reflect that interest shall also be used "[t]o improve the child support enforcement agency's ability to promptly disburse payments to the custodial parent." 1999 Haw. Sess. L. Act 300, § 3 at 921.

14. Sherry Wang, CSEA's Chief Financial Officer, was initially unable to obtain the information regarding delinquent and held payments from the system, as required by the court's Summary Judgment Order. She eventually persuaded CSEA staff to create a program that would allow her to obtain that information from the KEIKI system. This allowed her to comply with the court's Summary Judgment Order with respect to an accounting, provide the federal government with accurate information regarding the collection and distribution of child support, and to fully understand the CSEA's financial picture by 2002.

Pursuant to the Stipulation Re: Accounting Date approved and filed on July 11, 2002, the relevant date was changed to February 28, 2002.

### III.

Following the court's grant of partial summary judgment, the following matters were left for determination.

Count I Declaratory Relief:

(1) Whether delay by the CSEA in disbursing child support payments within the time frames specified violates HRS § 571-52.2(e);

(2) Whether child support payments become the property of the minor obligees upon expiration of the two or five working-day period specified by HRS § 571-52.2(e) and whether or not so concluding and/or not concluding that any accrued interest after that point is also the obligee's property would frustrate the purpose of HRS Chapter 571 and/or would provide an incentive for remaining in violation of a valid statute.

(3) Whether HRS §§ 571-52.2(e) and 576D-10 are statutes which are *in pari materia* and must be read in a manner consistent with their legislative purpose and which does not emasculate or delete one another.

(4) Whether Defendants hold child support payments for the benefit of the obligees pursuant to HRS § 576D-10, and *whether Defendants are fiduciaries for the purpose of disbursing those payments.*

(5) *Whether the defendants have both fiduciary and implied contractual duties to disburse child support payments within the time frame specified* in HRS § 571-52.2(e); and

(6) *Whether Defendants have a fiduciary duty to provide Plaintiffs with a full accounting* of the identities of the persons to whom child support disbursements are still owed.

Count II, requesting Injunctive Relief:

(1) Whether Plaintiffs are entitled to an injunction directing Defendants to immediately [begin] disbursements of delinquent child support payments; and

(2) Whether Plaintiffs are entitled to an injunction directing defendants to implement a system by which child support payments will be disbursed within the time frame required by statute.

Count III, claiming damages for Breach of Implied Contractual Duties:

(1) *Whether the Defendants have an implied contractual duty to disburse child support payments within the time frames* required by HRS § 571-52.2(e);

(2) If so, *whether the Defendants are failing to disburse child support payments within the time frames* required by HRS § 571-52.2(e); and

(3) If so, whether through such failure, the Defendants have materially breached any such implied contractual duties.

Count IV, claiming damages for Breach of Fiduciary Duty:

(1) Whether under HRS § 576D-10, Defendants are required to hold collected child support payments in trust for the benefit of the obligees, particularly the children; and

(2) If so, *whether Defendants have failed to abide by those fiduciary duties by failing to disburse child support payments within the time frame required* by HRS § 571-52.2(e).

Count V, requesting an Accounting/Information:

(1) *Whether there are persons who have not received child support payments on a timely basis;* and

(2) If so, *whether Defendants have a fiduciary duty to provide Plaintiffs with an accounting* or information concerning such persons.

Count VI, *requesting the Creation of a Common Fund,* for the benefit of the Class, to distribute any delinquent child support payments.

(Emphases added.)

A bench trial took place with respect to the foregoing matters from September 10 to 20, 2002, with Kemp, individually, as next friend of Lindsay Agnes Kemp, and as representative of the Plaintiff Class as defined in the Class Order, *see supra* section II.B, and the CSEA as parties. Plaintiffs' expert, Steve Sakamaki (Sakamaki), presented testimony questioning whether up to nine million dol-

lars in child support payments had somehow disappeared in the CSEA's accounting system and remained unaccounted for, based on his inability to reconcile information obtained from the KEIKI system to the CSEA's bank accounts.

### A.

On October 22, 2002, the court entered its Memorandum of Decision (the Memorandum of Decision). Regarding Plaintiffs' allegation that there were up to nine million dollars in unpaid child support payments, upon which the entire complaint was based, the court found that Plaintiffs failed to meet their burden of proof. The court found that, based on the improvements made to the KEIKI system, *see supra* note 14, it was likely that Sakamaki's inability to reconcile the information in the KEIKI system with CSEA's bank accounts was caused by "bad data" and incomplete data, rather than actual mismanagement of funds.

Pertaining to the timeliness of disbursements, the court first noted that, although the class action lawsuit had been pending for over four years, Kemp was the only custodial parent class member to testify to a delay in the processing of payments since the KEIKI system was implemented in 1998. The court then concluded that the "overwhelming majority of child support payments" were being disbursed in a timely manner:

> [T]he strong weight of *uncontroverted evidence* indicates that after the initial problems of 1998, and excluding situations involving "bad addresses" or other "holds" on disbursement authorized by law, the CSEA has been disbursing the *overwhelming majority* of child support payments received that are subject to [HRS] § 571–52.2(e) within two days of its receipt of the forwarded checks.

(Emphases added.)

Although the trial revealed evidence that, for the most part, the CSEA was making timely disbursements of child support, it also revealed that there were problems with "uncashed checks" and holds due to "bad addresses." The CSEA issued checks totaling $819,016 to custodial parents from a Bank of Hawai'i account that had been inactive since the implementation of the KEIKI system in 1998, that remain uncashed. There were additional outstanding checks from other accounts which were opened subsequent to the implementation of the KEIKI system in 1998 that also remain uncashed. The CSEA reported an additional $1,079,000 in checks issued from these accounts and outstanding for more than 90 days as of February 28, 2002. The CSEA checks state that they are void if not cashed within 90 days. The CSEA had been aware of the problem of "uncashed checks" but had not attempted to rectify the situation to ensure that financial support reached custodial parents.

The court found that, as of July 4, 2002, the CSEA had $1,711,532 on "hold" due to "bad addresses." All CSEA checks contain a warning, stated in the following manner:

> You must notify the child support enforcement agency immediately of any change to your mailing address to insure uninterrupted distribution of available support payments. Change of address information should be sent to your local child support office if you live in Hawai'i, or to the return address on the envelope if you live out of state.

> If you move or change your address without notifying us, the payment will be mailed to the forwarding address that is provided by the Post Office. Support payments that cannot be mailed because of the lack of a good mailing address may be returned to the obligor/payor.

When a check is returned because of a "bad address" the CSEA requests forwarding information from the United States Postal Service. In recent years, automated computer cross-checks with other agencies' databases have been implemented. The CSEA has made no other attempt to locate the persons whose checks have been returned due to "bad addresses."

The court decided that although there was no evidence of nine million dollars of unpaid child support, the CSEA was holding $3,609,548 in child support payments because checks had been issued and not redeemed or the checks had been returned as undeliverable (*i.e.*, the "uncashed check" and "bad address" funds).

The court, relying on *Office of Hawaiian Affairs v. State*, 96 Hawai'i 388, 400, 31 P.3d

901, 913 (2001), found that Count I, claim 1, regarding violation of HRS § 571–52.2(e), was not justiciable because there was a "lack of judicially discoverable and manageable standards[.]" Furthermore, the court found that the requisite "actual controversy" mandated by HRS § 632–1 (1993) [15] did not exist because the parties agreed that the two-day time limit was "triggered" upon CSEA's receipt of the check. The court therefore declined to grant a declaratory judgment on this issue.

In connection with Count I, claim 2, regarding the property rights of minor obligees and the allegation that allowing the agency to retain interest earned on late payments would create an incentive to violate a valid statute, the court found that Plaintiffs "undoubtably" have a cognizable property interest in the child support payments granted on their behalf at the point in time when the CSEA's bank receives notification that the negotiable instrument has cleared in situations involving such instruments or upon receipt of a cash payment by the CSEA. The court found that the remainder of the claim did not request declaratory relief available under HRS § 632–1. Therefore, the court only granted declaratory relief to the extent that Plaintiffs had a cognizable property interest in the child support payments collected on their behalf when the CSEA's bank notifies the agency that a negotiable instrument has cleared or when the CSEA receives a cash payment.

The court found that Count I, claim 3, requesting a declaration that HRS §§ 571–52.2(e) and 576D–10 are statutes which are *in pari materia*, was not a proper request for declaratory relief. The court found that Plaintiffs were merely seeking an advisory ruling and, therefore, denied this request for declaratory relief.

The court declined to issue a declaratory ruling regarding Count I, claim 4, requesting a declaration that the agency holds child support disbursements for the benefit of minor obligees, because it did not concern an actual controversy. The court stated, "There

is no actual controversy with respect to the issue of whether Defendants hold child support payments for the benefit of the obligees pursuant to H.R.S. § 576D–10—it is axiomatic that they do." The court did grant Plaintiffs' request for declaratory relief to the extent that it found that CSEA has a fiduciary relationship with the obligees.

Regarding Count I, claim 5, concerning the CSEA's fiduciary and implied contractual duties, the court found that as a consequence of its fiduciary relationship with the obligees, CSEA has a fiduciary duty to disburse child support payments within two days of receipt, noting that the duty was triggered at the time when (1) CSEA's bank notified CSEA that a negotiable instrument had cleared or (2) upon receipt of a cash payment. Therefore, the court granted Plaintiffs' fifth request for declaratory relief inasmuch as CSEA had a *fiduciary* duty to disburse payments in a timely manner. However, the court found that CSEA did not have an implied contractual duty to disburse payments within the time limits set forth in HRS § 571–52.2(e), noting that in cases where implied contracts had been found to exist, there were only two parties involved and there was a mutual intent to contract. The portion of the request for declaratory relief regarding implied contractual duties thus was denied.

In connection with Count I, claim 6, requesting an accounting of obligees who were owed child support disbursements, the court had ordered, in its Summary Judgment Order, that CSEA provide a full and complete accounting of overdue child support payments in its possession as of July 31, 2000. By stipulation, the relevant date was changed to February 28, 2002. Based on the evidence adduced at trial that CSEA is now disbursing child support payments within the time limits prescribed by HRS § 571–52.2(e), the court set aside that part of the Summary Judgment Order. However, the court did order CSEA to provide an accounting regarding funds in the "uncashed check" and "bad address" categories, finding that the plaintiffs

---

15. HRS § 632–1 (1993), entitled "Jurisdiction; controversies subject to," provides, in pertinent part:

Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation[.]

in the "uncashed check" and "bad address" categories fell under the third definition of the class:

All Persons who were after the filing of the Class Order on May 17, 1999, entitled to received [sic] child support payments through the CSEA of the State of Hawai'i, and who did not or will not receive their child support payments, without legal justification, within the time limits set forth in the Hawai'i Revised Statutes, including persons for whose benefit child support payments are tendered.

Therefore the court ordered as follows:

(a) *The CSEA has a fiduciary duty to provide Plaintiffs with a full and complete accounting of checks issued to custodial parents that have remained outstanding or uncashed for a period of at least 90 days as of December 31, 2002,* and that this accounting must be sorted and provided in two separate lists: (1) a list in alphabetical order by the custodial parents' last names, which shall also include the first names of the custodial parents, the check dates, the check numbers, and the amounts of the outstanding checks; and (2) a list in chronological order by check dates, which shall also include check numbers, amounts of checks, and custodial parents' last and first names....

(b) *The CSEA has a fiduciary duty to provide Plaintiffs with a full and complete accounting of amounts held in the "bad address" hold category with respect to checks issued to custodial parents that have been returned to the CSEA for "bad addresses" and have remained outstanding for at least 90 days as of December 31, 2002.* The accounting must be sorted and provided in two separate lists: (1) a list in alphabetical order by the custodial parents' last names, which shall also include the first names of the custodial

parents, the check dates, the check numbers, and the amounts of the outstanding checks; and (2) a list in chronological order by check dates, which shall also include check numbers, amounts of checks, and custodial parents' last and first names[.]

(Emphases added.) Plaintiffs note that the CSEA has never provided such an accounting.

B.

With regard to Count II, claim 1, seeking an injunction requiring the CSEA to immediately begin disbursing delinquent child support payments, the court found that Plaintiffs were requesting prospective relief and, therefore, CSEA's defense of sovereign immunity did not apply. Furthermore, the court found that Plaintiffs had prevailed on the merits of the case,[16] that custodial parents would suffer irreparable injury absent injunctive relief, that the prospective harm to Plaintiffs outweighed any harm threatened by the injunction, and that the public interest would not be adversely affected by the injunction but, rather, would be served by it.[17] Accordingly, the court found that Plaintiffs were entitled to a mandatory injunction requiring CSEA to disburse the child support payments in the "outstanding checks" and "bad address" categories.

Regarding Count II, claim 2, which would require the CSEA to institute a system by which child support payments would be disbursed in a timely manner, the court found that Plaintiffs failed on the merits because CSEA proved that it was disbursing the overwhelming majority of child support payments pursuant to orders of income assignment within two days. Therefore, Plaintiffs were not entitled to injunctive relief on this issue.

---

**16.** According to the court, Plaintiffs prevailed inasmuch as the court declared that they had a constitutionally protected property interest in the corpus of child support payments collected by the CSEA. The court ordered an accounting of funds held in the "outstanding check" and "bad address" categories, and concluded that CSEA

had a fiduciary duty to disburse child support payments.

**17.** The four-prong test for the granting of injunctive relief used by the court is set forth in *Indian Motorcycle Assocs. III Ltd. P'ship v. Mass. Hous. Fin. Agency,* 66 F.3d 1246, 1249 (1st Cir.1995).

### C.

Regarding Count III, requesting damages for breach of implied contractual duties, the court found in favor of Defendants based on the finding that CSEA had no implied contractual duties to disburse child support payments within the time limits set forth by the Hawai'i Revised Statutes.

### D.

The court ruled on Count IV, requesting damages for breach of fiduciary duty, in conjunction with Count VI, requesting the creation of a common fund. Regarding Count IV, claim 1, whether the CSEA is required to hold collected child support payments in trust for the benefit of the obligees, the court found that no express trust was created by the statutory scheme governing the CSEA. However, the court opined that a trust relationship did result from the statutory scheme, which could be characterized as "implied," "resulting," or "constructive." Regarding Count IV, claim 2, the court found that CSEA had not breached its fiduciary duties by failing to disburse child support payments in the time frames provided by law because Plaintiffs had failed to prove any continuing violations of the relevant statutes. However, because the court had determined that there was an ongoing problem with payments being held in the "uncashed check" and "bad address" funds, the court ordered that the relief sought in Count VI be granted and any money in those categories not disbursed pursuant to the March 31, 2004 [18] accounting, to be discussed *infra,* would become part of a common fund to benefit the Plaintiff Class.

In ordering that the child support payments held in the "uncashed check" and "bad address" categories become a common fund, the court found that the designation of the class under HRCP Rule 23(b)(2) did not preclude monetary relief, since the primary relief sought was declaratory and injunctive. The court further found that the issue of whether Plaintiffs were entitled to monetary relief was tried by the express or implied consent of the parties pursuant to HRCP Rule 15(b) [19] inasmuch as the Complaint requested an accounting and the court ordered an accounting in its Summary Judgment Order. Hence, according to the court, CSEA was put on notice that Plaintiffs were seeking monetary damages.

Regarding Count V, which requested an accounting and information, the court ruled that there were persons who had not received child support payments on a timely basis and ordered an accounting of such by March 31, 2004, as discussed *supra.*

### IV.

On December 9, 2002, the court entered its Order Re: Post–Decision Hearing which required Plaintiffs to submit motions dealing with attorneys' fees and costs and the creation of a common fund and the uses to which such a common fund would be put.

On December 17, 2002, Kemp filed a Motion for an Award of Interim Costs and Attorneys' Fees. Kemp requested attorneys' fees in the amount of $628,607.54 and costs in the amount of $99,065.40.

---

18. In its memorandum of decision, the court states that "the accounting shall be provided by March 31, 2002." However, the memorandum of decision is dated and was filed on October 22, 2002. The Award Order issued by the court on July 16, 2003, discussed *infra*, makes clear that the proper date is March 31, 2004.

19. HRCP Rule 15(b) (2006), entitled "Amended and supplemental pleadings; Amendments to conform to the evidence," states:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

On December 18, 2002, Kemp filed a Motion Regarding a Common Fund. Kemp argued that any undisbursed funds from the "uncashed check" and "bad address" categories be used for the benefit of the Class consistent with the purposes of the Child Support Enforcement Act under the *cy pres* doctrine, rather than escheat to the State. Kemp claimed that escheating the money to the State would reward the State for "failing to perform its fiduciary duty to get this money to the proper recipient." According to Kemp, the *cy pres* doctrine allows the court to distribute unclaimed funds " 'for the indirect prospective benefit of the class.' " (Quoting *In Re: Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619, 625 (8th Cir. 2001).) (Citations omitted.) Kemp suggested that the unclaimed funds be distributed to the Legal Aid Society of Hawai'i (LASH), which would provide assistance to custodial parents encountering difficulty getting their child support disbursements from the CSEA regardless of the custodial parent's income. The CSEA opposed this motion, contending that such distribution of the unclaimed money would violate the purpose of the Child Support Enforcement Act by "expropriating money from the affected custodial parent payees in the 'bad address' and 'uncashed checks' categories and spending it on services unrelated to the provision of child support to the intended custodial parent payees."

On January 7, 2003, Kemp filed a "Motion for Incentive Award Payment to Class Representative Ann C. Kemp," stating that "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." The CSEA opposed the request for an incentive award on the grounds that there is no statute or Hawai'i precedent allowing for such an award against the State; that Kemp filed the lawsuit voluntarily and any inconvenience was therefore undertaken voluntarily; that where public monies are involved, the law does not require compensa-

tion; that the monies for which the court has ordered an accounting are outside the parameters of the complaint and outside the class for which Kemp is a representative; and that Kemp did not prevail on many of the issues raised.

On January 22, 2003, the CSEA filed its memorandum in opposition to the award of attorneys' fees. The CSEA argued that Plaintiffs were not entitled to attorneys' fees because (1) sovereign immunity precludes the action upon which an award of attorneys' fees would be based and there is no statute entitling Plaintiffs to such an award; (2) the fees and costs must be rejected or discounted because Plaintiffs did not prevail on a majority of the issues; (3) trial of the issues on which Plaintiffs prevailed was unnecessary and Plaintiffs' counsel should not be rewarded for bringing such issues to trial; (4) a "common benefit" did not extend to Plaintiffs in this action; (5) a class fund had not been established and unless one was, the award of attorneys' fees would be premature; (6) Plaintiffs' attorneys were not "private attorneys general" [20]; and (7) if entitled to attorneys' fees and costs, Plaintiffs had the burden to submit documentation of reasonable hours relating to distinct claims.

On July 3, 2003, CSEA filed a supplementary memorandum in opposition to Plaintiffs' request for attorneys' fees. Attached to this memorandum was the declaration of James P. Schratz (Schratz), an attorney specializing in auditing billing statements, who had audited the statements submitted by Plaintiffs' counsel in support of their request for attorneys' fees. Schratz identified overbilling and duplicative activity and recommended that the award for attorneys' fees and costs be reduced accordingly. Schratz also recommended that the court disallow the costs associated with Sakamaki's testimony, in consideration of the fact that Sakamaki's testimony was disregarded by the court. After these deductions, the remaining fees that Schratz suggested were fair and reasonable

---

20. The "private attorney general" doctrine is referred to in *In re Water Use Permit Applications*, 96 Hawai'i 27, 29–32, 25 P.3d 802, 804–07 (2001). The private attorney general doctrine requires consideration of: "(1) the strength or societal importance of the public policy vindicat-ed by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff [and] (3) the number of people standing to benefit from the decision." *Id.* at 29, 25 P.3d at 804 (internal quotation marks and citation omitted).

amounted to $261,381.50 and the costs he deemed to be fair and reasonable amounted to $63,277.61.

On July 16, 2003, the court entered its Award Order. The court granted Plaintiffs' Motion for Costs and Attorneys' Fees pursuant to the "common benefit," "common fund," or "private attorney general" doctrines. The court found that Plaintiffs' counsel expended over 2,000 hours to

> pursue a novel, complicated, and difficult case, with no assurance that they would receive one penny of compensation for their efforts. Although Plaintiffs' counsel did not prevail on the claim for interest on past due child support payments, they did, *inter alia,* establish the availability of judicial intervention to enforce constitutional rights to the corpus of child support payments, over the strenuous and repeated sovereign immunity arguments of the State.

In recognition that some of the work of the Hawai'i and mainland attorneys was duplicative, the court reduced the hourly rate from $350.00 billed by the mainland attorneys and $250.00 billed by the Hawai'i attorneys to $185.00. Furthermore, the court disallowed the 32.05 hours billed by associates of the mainland associates who were not specially admitted to practice in Hawai'i for this case. However, the court allowed an additional 50 hours for time spent in the future proceedings,[21] for a total of 2,201.47 hours, resulting in attorneys' fees of $403,951.20. Although Schratz urged the court to disallow costs pertaining to Sakamaki's testimony, the court did not accept that recommendation, finding that, although the court rejected his conclusions, his testimony was beneficial to the court's understanding of the CSEA's accounting practices. The court did, however, accept CSEA's objection to $2,354.45 in travel costs, thus awarding $96,710.95 in costs. The court declined to assign the funds remaining in the "uncashed check" and "bad address" categories after distribution of all distributable funds to LASH. Instead, the court ordered that any funds remaining in

those categories after March 31, 2004, be applied to the attorneys' fees and costs ordered under the common fund theory, or to be "held or distributed by Defendants pursuant to applicable law." Finally, the court denied Plaintiffs' motion for an incentive award payment to Kemp.

### V.

On July 16, 2003, the court entered its Final Judgment, which reiterated the Memorandum of Decision but also included orders for giving Notice to Class Members about the Final Judgment.

On July 25, 2003, CSEA filed a Motion to Amend Findings of Fact and Conclusions of Law and to Amend Judgment. Specifically, CSEA objected to the court's findings that the issues regarding monetary relief and the "reasonableness" of CSEA's retention of funds in the "uncashed check" and "bad address" categories were tried by express or implied consent of the parties, claiming that the issue was tried only in regards to Plaintiffs' claim to the interest generated from late payments, not to any claim on the payments held in the "uncashed check" or "bad address" categories. CSEA contended that "[t]he only factual issues in the case that were tried by the parties were the timeliness of payments to custodial parents under [HRS] § 571–52.2(e)[,]" not the reasonableness of efforts to locate obligees with bad addresses or of efforts to make payees with uncashed checks redeem their payments.

CSEA claimed that it was never put on notice that the "real claim" being tried was whether the agency acted reasonably in attempting to disburse the child support payments held in the "uncashed check" and "bad address" categories. CSEA further contended that it did not expressly or implicitly consent to trying those issues. According to the CSEA, under HRCP Rule 15(b),[22] the court could not treat the complaints as amended to fit the facts adduced at trial because "the course of the trial did not de-

---

**21.** The "future proceedings" contemplated by the court included preparation of proposed class action notice and memoranda regarding the proposed role of a neutral accountant to oversee the accounting order by the court.

**22.** *See supra* note 19.

part so materially from the image of the controversy pictured in the pleadings or by the discovery process that it would become necessary to adjust the pleadings to reflect the case as it was actually litigated in the courtroom." (Emphasis omitted.) CSEA maintained that the issue of the "uncashed check" and "bad address" categories was tried only in the context of timeliness raised by the Complaint, and not in the context of the reasonableness of the agency's actions. On August 14, 2003, the court denied this motion.

On September 11, 2003, the CSEA filed its Notice of Appeal, appealing from (1) the Award Order; (2) the Final Judgment; and (3) the Amendment Order. The CSEA also challenges the Memorandum of Decision. On September 25, 2003, Plaintiffs filed their Notice of Cross–Appeal appealing from (1) the Summary Judgment Order; and (2) the Final Judgment. Plaintiffs also challenge the Memorandum of Decision.

## VI.

CSEA raises five points of error on appeal. It argues that the court erred (1) in its conclusion that CSEA breached its fiduciary duty regarding uncashed and undeliverable checks and violated the constitutional rights of recipients in those categories; (2) in determining that Kemp could adequately represent persons who had failed to cash checks or notify CSEA when they changed their addresses; (3) in its conclusion that the Plaintiff Class had created a common fund of undistributed money for the purposes of awarding costs and attorney's fees; (4) in awarding attorney's fees because the CSEA was protected under the doctrine of sovereign immunity; and (5) in awarding Plaintiff Class attorney's fees and erred in the amount, "particularly given [P]laintiffs' overall lack of success."

In conjunction with its first point of error, CSEA argues that "[it] did nothing wrong." In conjunction with its second point of error, CSEA maintains that the class definition was improperly expanded to include persons in the "uncashed check" and "bad address" categories. Finally, in conjunction with its third point on appeal, CSEA contends that (a) the court disregarded the rights of the federal government and the non-custodial parent in its conclusion that Plaintiffs had created a common fund, and (b) the court discussed "three different legal theories (common fund, common benefit, private attorney general) without analysis or discussion of any of them." CSEA requests that the court's Final Judgment be reversed and the case remanded with instructions to enter judgment on its behalf.

In response, Plaintiffs assert that (1) the issues raised by CSEA regarding breach of fiduciary duty, violation of constitutional rights, the identity of the class representative, and the definition of the class are moot inasmuch as CSEA has fully complied with the provisions of the Final Judgment related to an accounting, notice, and disbursement; (2) "the court's actions were proper in response to the request for an accounting" because "one of the hallmarks of an action for an accounting is that it confers upon the court broad power in equity to fashion a remedy that is appropriate to the facts of the case;" (3) "Kemp was an appropriate class representative;" (4) under HRCP Rule 23(b)(2), the class definition did not have to be precise; and (5) the award of fees was proper because (a) CSEA is not protected by sovereign immunity, and (b) fees were appropriately awarded and were of a proper amount.

In reply, CSEA maintains that (1) there is no legal basis for requiring the CSEA to take further action with respect to uncashed checks and "bad address" checks; (2) CSEA's compliance with the Final Judgment does not render the issue of the attorney's fees moot; (3) the federal government has an interest in the funds deposited with the CSEA; (4) the 2000 Audit which concluded that the CSEA had "substandard internal accounting practices" does not mean that CSEA has failed to make timely external payments, has breached a fiduciary duty, or has infringed on constitutional property rights; and (5) although the court initially ordered an accounting, the court subsequently approved a stipulation extending the accounting date, and later set aside its summary judgment order in this respect.

Plaintiffs raise three issues on cross-appeal: (1) the court erred in ruling that the

class had no property interest in the interest earned upon child support payments that were not paid within the time required by law; (2) "the court erred by not ordering CSEA to provide Plaintiffs with an accounting of interest that had been earned with regard to individual class members whose child support had not been paid within the time limits prescribed by law"; and (3) the court erred in concluding that the CSEA did not have an implied contractual duty to disburse payments within the time frame provided by law.

In conjunction with their points on appeal, Plaintiffs argue that (1) "the CSEA is required to disburse payments within two business days of collection and is authorized by statute to retain [interest] earned only during that limited period"; (2) "earned interest is property taken without just compensation"; (3) "the position taken by Plaintiffs is consistent with Hawai'i precedent"; (4) "sovereign immunity does not prevent an accounting"; and (5) "CSEA had an implied contractual duty to disburse child support payments ·in a timely manner." Plaintiffs request that this court reverse the Summary Judgment Order insofar as it orders that Plaintiffs do not have a property interest in the interest earned on the corpus of child support payments held by the CSEA. Plaintiffs further request that the Final Judgment be reversed and that the case be remanded to the court with instructions to permit the accounting requested by Plaintiffs. Finally, Plaintiffs request that the Memorandum of Decision, as reiterated in the Final Judgment, be reversed and that the court rule as a matter of law that an implied-in-fact contract existed between Plaintiffs and the CSEA regarding timely disbursement of child support payments.

In response, CSEA asserts on cross-appeal that (1) "Plaintiffs seek an advisory opinion on their entitlement to interest" because the court's finding that CSEA was not delinquent was not challenged; (2) "Plaintiffs are not entitled to an accounting of interest" on late payments because the court's finding that CSEA was not delinquent was not challenged; and (3) "Plaintiffs seek an advisory opinion on the existence of an implied contract" because (a) the issue of an implied contract is moot inasmuch as the court's find-

ing that CSEA was not delinquent was not challenged, and (b) "Plaintiffs are asserting an implied-in-law contractual duty based on their subjective view of what is 'equitable' " and such claim is barred by sovereign immunity.

In reply, Plaintiffs contend that (1) the Summary Judgment Order should be reviewed de novo; (2) CSEA misrepresents the court's finding that it was not delinquent; (3) the issue of whether Plaintiffs have a property interest in interest earned on money held by CSEA is not moot inasmuch as Plaintiffs have not "had a chance to do discovery or present evidence on that issue;" (4) "this court should recognize a property interest in interest earned by the CSEA on delinquent payments;" (5) if such property interest is recognized, Plaintiffs are entitled to an accounting; and (6) this claim is based upon an implied-in-fact contract which "has all the elements of a bailment."

## VII.

■■■ Based on our conclusions, *supra*, we only discuss the standards of review relevant to this disposition. The CSEA's first issue on appeal, whether CSEA breached its fiduciary duties and violated the constitutional rights of the class members, is a question of law. *See Lewis v. Knutson*, 699 F.2d 230, 235 (5th Cir.1983) (holding that the existence of a fiduciary duty is a question of law). "Questions of law are reviewable *de novo* under the right [or] wrong standard of review." *Mikelson v. United Servs. Auto. Ass'n*, 107 Hawai'i 192, 197, 111 P.3d 601, 606 (2005) (quoting *Ditto v. McCurdy*, 102 Hawai'i 518, 521, 78 P.3d 331, 334 (2003)). Inasmuch as Plaintiffs also claim a constitutional violation of their property rights, we review questions of constitutional law under the right or wrong standard. *Freitas v. Admin. Dir. of Courts*, 108 Hawai'i 31, 37, 116 P.3d 673, 679 (2005).

■■■ The CSEA's second issue on appeal questions whether the court erred in finding that Kemp adequately represented the class members who fell under the "uncashed check" and "bad address" categories.

A trial court is vested with "broad discretion in deciding whether to certify a class," and discretionary authority is normally undisturbed on review. *Filipo v. Chang*, 62 Haw. 626, 636, 618 P.2d 295, 301 (1980). But where the record discloses a possible misapprehension or misapplication of Rule 23's criteria, it is incumbent upon us to conduct a careful review of the rule's application to the facts involved, especially where questions respecting the adequacy of representation are raised.

*Life of the Land v. Land Use Comm'n*, 63 Haw. 166, 180, 623 P.2d 431, 443 (1981) (footnote omitted).

■ The CSEA's third issue raised on appeal, whether the court erred in ruling that the Plaintiff Class had created a common fund that could be used for attorneys' fees and costs, is reviewed *de novo* under the right or wrong standard. *See Montalvo v. Chang*, 64 Haw. 345, 641 P.2d 1321 (1982), *overruled in part by, Chun v. Bd. of Trs. of the Employees Ret. Sys.*, 92 Hawai'i 432, 992 P.2d 127 (2000) (applicability of common fund doctrine reviewed *de novo* ).

■ Kemp's first two issues on appeal, whether the court erred in ruling that the Plaintiff Class did not have a constitutionally protected property interest in any interest accrued by child support payments held by the CSEA and whether the court erred in not ordering an accounting of such interest, arise from the court's Summary Judgment Order. The court's grant or denial of summary judgment is reviewed *de novo*. *Hawaii Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000) (citation omitted). Pursuant to HRCP 56, summary judgment is granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Pioneer Mill Co. v. Dow*, 90 Hawai'i 289, 295, 978 P.2d 727, 733 (1999).

Kemp's third issue on appeal, whether the court erred in concluding that the CSEA did not have an implied contractual duty to disburse child support payments in a timely manner, is a question of law, which is reviewed de novo. *Mikelson*, 107 Hawai'i at 197, 111 P.3d at 606.

## VIII.

### A.

CSEA's second issue on appeal is discussed first because our determination that Kemp was not an adequate class representative is dispositive of other issues on appeal. To reiterate, CSEA's second point on appeal challenges the court's determination that Kemp could adequately represent class members in the "uncashed check" and "bad address" categories. Plaintiffs assert that CSEA never filed a motion challenging Kemp's ability to act as class representative. While no separate motion was filed, CSEA did object to Kemp acting as class representative in its "Memorandum in Opposition to Plaintiff's Motion for Order Determining Class Issues." CSEA argued that "[Kemp]'s non-Title IV–D status raises serious questions about [her] standing to bring suit on behalf of Title IV–D participants and about the alleged commonality to facts and law that allegedly underpin this action, in regards to [Kemp]'s burden under HRCP [Rule] 23(a)."

Plaintiffs also allege that the issue of the propriety of Kemp as class representative is moot, along with the issues of breach of fiduciary duty and definition of the class, because CSEA has fully complied with the provision of the Final Judgment related to an accounting, notice, and disbursement.

### B.

■ We first address Plaintiffs' mootness arguments inasmuch as mootness implicates this court's jurisdiction to address the issues herein. *See Life of the Land v. Burns*, 59 Haw. 244, 250, 580 P.2d 405, 409 (1978) (stating that, ordinarily, " 'courts will not consume time deciding abstract propositions of law or moot cases, and have no jurisdiction to do so[ ]' " (quoting *Territory v. Aldridge*, 35 Haw. 565, 568 (1940))). Plaintiffs assert that CSEA's arguments regarding breach of fiduciary duty, violation of constitutional rights, identity of class representatives and the definition of the class are moot inasmuch as CSEA complied with the

provisions of the Final Judgment requiring CSEA to (1) provide an accounting with regard to persons falling within the "bad address" and "uncashed check" categories, (2) send notice and follow-through with a claim procedure to persons in those categories, and (3) disburse money to those submitting claims to the CSEA.

■ With respect to mootness, the following has been stated by this court:

> A case is moot if it has lost its character as a present, live controversy of the kind that must exist if courts are to avoid advisory opinions on abstract propositions of law. The rule is one of the prudential rules of judicial self-governance founded in concern about the proper—and properly limited-role of the courts in a democratic society. We have said the suit must remain alive throughout the course of litigation to the moment of final appellate disposition to escape the mootness bar.

*Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 87, 734 P.2d 161, 165 (1987) (internal citations, quotation marks, and brackets omitted). Simply put, "[a] case is moot if the reviewing court can no longer grant effective relief." *City Bank v. Saje Ventures II,* 7 Haw.App. 130, 134, 748 P.2d 812, 815 (1988) (quoting *United States v. Oregon,* 718 F.2d 299, 302 (9th Cir.1983)).

CSEA's contention that the issues it raises are not moot is persuasive. The effective relief it seeks is the vacatur of the court's award of attorney's fees. CSEA argues that "[t]here was no legal basis for imposing any liability or injunctive relief on CSEA for uncashed checks and bad addresses." Accordingly, inasmuch as a live controversy remains as to the imposition of liability on the CSEA, including the award of attorney's fees, and in light of the availability of effective relief, the issues raised by the CSEA are not moot notwithstanding its compliance.

## C.

■ The party seeking class certification assumes the burden of "establishing the four prerequisites for class certification delineated in Rule 23(a)" as well as "demonstrating the presence of a suitable situation for the maintenance of a class action" under HRCP Rule 23(b). *Life of the Land,* 63

Haw. at 180–81, 623 P.2d at 443 (internal citations omitted). "A failure to satisfy the burden in any respect can result in a denial of the necessary certification." *Id.* at 181, 623 P.2d at 443 (citations omitted). HRCP Rule 23(a) entitled "Prerequisites to a class action," states as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Upon review, this court must determine whether Kemp met these requirements and was thus an appropriate class representative.

The CSEA contends that Kemp's claims were not "typical of the claims or defenses of the class." In *Life of the Land,* this court stated that "[t]he crucial question here is paraphrased in [*Moore's Federal Practice*] as 'What Is The Individual Claim (Or Defense) Of The Class Representative,' and the primary requisite is that his claim or defense be essentially similar to the claims or defenses throughout the class." *Id.* at 182, 623 P.2d at 444 (citing 3B *Moore's Federal Practice* ¶ 23.06–2 at 23–191 (1980)). As to the requirement of HRCP Rule 23(a)(3) that the claims of the representative be typical of the claims of the class as a whole, this court has equated typicality with the absence of conflict of interest. *Id.* at 183, 623 P.2d at 445.

■ Kemp fails to meet the requirement of HRCP Rule 23(a)(3). "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 625–26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974))). Kemp's individual claim was that she was entitled to interest earned on child support payments

that were disbursed in an untimely manner. Kemp's claim was based on the presumption that the CSEA was not disbursing child support payments within the time periods prescribed by law. On the other hand, the claim of the Plaintiffs in the "uncashed check" and "bad address" category was inherently dissimilar to Kemp's claim. The court found that those plaintiffs were entitled to the *corpus* of child support payments made for their benefit that were sent out by the CSEA in a timely manner, but were not redeemed.

The claims of the Plaintiffs in the "uncashed check" and "bad address" categories rested on the fact that the CSEA was disbursing child support payments in a timely manner, but allegedly was making no attempt to ensure that the obligees actually received the funds. Kemp's claims and the claims of obligees whose child support payments were held in the "uncashed check" or "bad address" categories are based on failures at different times in the disbursement process. Kemp's claim is grounded on the CSEA's alleged failure to comply with its statutory duty to disburse child support payments within the time specified in HRS § 571–52.2(e), whereas the claims of the "uncashed check" and "bad address" Plaintiffs are premised on the failure of those Plaintiffs to redeem checks that were sent in a timely manner or to notify the agency of their new address. Hence, Kemp's claim to interest made on late child support disbursements was not "essentially similar" to the claims of the Plaintiffs in the "uncashed check" and "bad address" categories such that Kemp satisfied the typicality requirement of HRCP 23(a)(3).

Plaintiffs concede that Kemp "did not have a personal situation that covered all the relief provided by the court." However, Plaintiffs assert that she had claims "related" to the other claims and that she performed her responsibilities as class representative in an exemplary manner. As discussed *supra*, a claim must be more than "related" to satisfy the requirements of HRCP Rule 23(a). Also, with all due regard to Kemp's role, the manner in which she performed her duties is wholly irrelevant to whether she was an appropriate class representative. The fact remains that she did not " 'possess the same interest and suffer the same injury' as the

class members." *Amchem Products*, 521 U.S. at 625–26, 117 S.Ct. 2231.

Further, the significance of Kemp's role is illustrated by the binding effect of a judgment on class members. HRCP Rule 23(c)(2) states in relevant part:

> In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that ... (B) *the judgment, whether favorable or not, will include all members who do not request exclusion.*

(Emphasis added.) *See also Akau v. Olohana Corp.*, 65 Haw. 383, 388, 652 P.2d 1130, 1134 (1982) (explaining that "[a] judgment in a class action consisting of the people actually injured will bind the members who are all those allowed to sue[ ]").

In *DuPont v. Wyly*, 61 F.R.D. 615, 621 (D.Del.1973), the United States District Court for the District of Delaware discussed the importance of a proper class representative:

> The requirement that the representative parties will fairly and adequately protect the interest of the class plays a crucial role in the class action scheme of amended Rule 23. Since that scheme holds the potential of binding class members who have no actual knowledge of the suit, the requirements of due process, as well as the necessity for confidence in the judicial process, demands assurance that representative parties can be counted upon to faithfully defend the interests of all members of the class.

*See also Van de Walle v. Unimation, Inc.*, 8 Del. J. Corp. L. 623, 628–29, 1983 WL 8949 (Del.Ch.1983) (stating that "[i]t is agreed, by all courts, that the selection of a proper class representative is an important consideration"); *Free World Foreign Cars, Inc. v. Alfa Romeo*, 55 F.R.D. 26, 29 (S.D.N.Y.1972) (concluding that Plaintiff was not an appropriate class representative because the concerns of the plaintiffs he would represent were "of no concern to [him]"). We agree with the proposition in *Wyly* that an appro-

priate class representative that can "faithfully defend the interests of all members" is of the utmost importance in a class action. *Wyly,* 61 F.R.D. at 621.

## D.

▮ The CSEA also argues that the "class" as defined by the court in its Memorandum of Decision, was an improper expansion of the class as defined in the Class Order. The class was originally certified to include obligees "who did not or will not receive their child support payments, *without legal justification,* within the time limits set forth in the Hawai'i Revised Statutes[.]" The CSEA argues that the "without legal justification" qualification necessarily excludes those obligees who did not receive their child support payments as a result of their own actions, *i.e.,* failing to redeem timely mailed checks or failing to notify the CSEA of a change of address. We believe the CSEA's argument is persuasive. "Without legal justification" implies that the child support payment did not reach the obligee because of the CSEA's actions. The CSEA cannot compel a custodial parent to redeem the child support check or to submit the necessary information informing the CSEA of a current address for the custodial parent. Rather, the failure of the custodial parent to redeem the check or to update his or her address is a "legal justification" for the CSEA's inability to disburse funds held in the "uncashed check" and "bad address" categories. Therefore, we hold that the court erred in including those obligees in the class definition.

Because Kemp could not adequately represent obligees whose child support payments were held in the "uncashed check" and "bad address" categories and because those obligees were not included in the class as it was defined in the Class Order, the judgments in favor of the obligees whose child support payments were held in the "uncashed check" and "bad address" categories are vacated and remanded with orders to dismiss. *Amchem,* 521 U.S. 591, 117 S.Ct. 2231; *Lierboe v. State Farm Mut. Auto. Ins. Co.,* 350 F.3d 1018 (9th Cir.2003).

## IX.

The CSEA claims that the court erred in finding that the agency breached its fiduciary duty to custodial parents whose payments were held in the "uncashed check" and "bad address" categories. Because we have determined that the Plaintiffs in the "uncashed check" and "bad address" categories were not adequately represented, the conclusion that the CSEA breached its fiduciary duty towards those plaintiffs must be vacated. *Amchem,* 521 U.S. 591, 117 S.Ct. 2231; *Lierboe,* 350 F.3d 1018.

## X.

▮ The CSEA's third point on appeal alleges that the court erred in awarding attorneys' fees to Plaintiffs. In its Opening Brief, CSEA states that "[e]ven though there was no valid class, [the] CSEA has complied with and does not argue on appeal the invalidity of the relief concerning notice and disbursement to the 'class' members. However, the award of attorneys' fees, based in part on the existence of a 'class' was error[.]" Plaintiffs note that the CSEA was able to distribute millions of dollars from the "uncashed check" and "bad address" funds within several months of being ordered to do so. The CSEA itself agrees that it has "fully complied with the portion of the judgment requiring, where possible, notice to and repayment of persons in the uncashed check and bad address categories."

Plaintiffs misinterpret the CSEA's appeal of the award of fees and costs as an argument that the court "exceeded its authority in ordering disbursement of these funds[.]" On the contrary, the CSEA is arguing that the money remaining in the "uncashed check" and "bad address" accounts after March 31, 2004 was not under the control of the court and thus was unavailable for an award of attorneys' fees and costs. The CSEA contends that the federal government, the non-custodial parents, and the Hawai'i Legislature all had superior claims to the money.

CSEA maintains that the federal government has a superior claim to the money in order to reimburse the government for public assistance payments made to families who were supposed to receive child support payments through the CSEA as provided for

under 45 C.F.R. § 302.32. *See supra* note 7. Further, the CSEA contends that the noncustodial parents have a superior claim to any money in the "bad address" category that is not disbursed by March 31, 2004 based on the warning that is printed on all CSEA checks. As noted previously, the warning states in relevant part, "Support payments that cannot be mailed because of the lack of a good mailing address may be returned to the obligor/payor." Finally, the CSEA argues that the State has a superior claim to any money left in the "uncashed check" and "bad address" funds after that money is deemed abandoned pursuant to HRS § 523A–13 (1993)[23] and goes through the lengthy process to escheat the abandoned funds to the State's general fund set forth in HRS chapter 523.

Pursuant to the "American Rule," each party usually pays its own litigation expenses. *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 444, 32 P.3d 52, 88 (2001); *Chun*, 92 Hawai'i at 439, 992 P.2d at 134. There are several exceptions to this general rule which allow fee-shifting such that the losing party pays the fees of the prevailing party, "when so authorized by statute, rule of court, agreement, stipulation, or precedent." *Id.* (citations omitted). Inasmuch as we have determined that the obligees whose child support payments were held in the "uncashed check" and "bad address" categories were not adequately represented by Kemp, thus rendering it improper for the court to decide issues pertaining to those obligees, Plaintiffs cannot be considered the prevailing party such that a fee-shifting exception to the American Rule, such as the common fund doctrine, can be invoked. An improper award of attorneys' fees and costs is reversed. *See e.g., JAZ, Inc. v. Foley*, 104 Hawai'i 148, 85 P.3d 1099 (App. 2004) (reversing award of fees following re-

versal on appeal of lower court's decision on the merits). Based on the foregoing, the award of attorneys' fees and costs is reversed.

## XI.

The CSEA's fourth point of appeal contends that it was protected from the award of attorneys' fees under the doctrine of sovereign immunity. The court never made a specific ruling regarding the applicability of sovereign immunity to the request for attorneys' fees. Because we have already determined that the award of attorneys' fees and costs was improper inasmuch as Plaintiffs have not prevailed on their claims, we need not determine whether such an award was barred by sovereign immunity.

## XII.

The CSEA's fifth point on appeal is that the court erred in awarding fees and costs to Plaintiffs and erred in the amount of the award, especially considering Plaintiffs' overall lack of success on the pleaded complaints. Having already reversed the court's award of attorneys' fees and costs pursuant to the common fund doctrine, because Plaintiffs were not entitled to such an award, we need not determine whether the amount the court awarded was appropriate.

## XIII.

### A.

Plaintiffs' first and second points on their cross-appeal concern their claim to interest earned on allegedly delinquent child support payments and their request for an accounting of said interest. Plaintiffs contend that the court erred in ruling

> that based on [HRS] §§ 576D–10,[24] 661–8,[25] 662–2,[26] and 662–8,[27] Plaintiff has no state property interest on payments not

**23.** HRS § 523A–13 (1993), entitled "Property held by courts and public agencies," provides that "[i]ntangible property held for the owner by a court, state, or other government, governmental subdivision or agency, public corporation, or public authority which remains unclaimed by the owner for more than one year after becoming payable or distributable is presumed abandoned."

**24.** See *supra* note 13.

**25.** HRS § 661–8 (1993), entitled "Interest," provides that "[n]o interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the court, unless upon a contract expressly stipulating for the payment of interest, or upon a refund of a payment into the 'litigated claims fund' as provided by law."

**26.** HRS § 662–2 (1993), entitled "Waiver and liability of State," provides that "[t]he State hereby waives its immunity for liability for the torts

made within the time period prescribed by [HRS] § 571–52.2(e). Therefore, members of the Plaintiff [C]lass have no cognizable State constitutional property interest based on [HRS] § 571–52.2(e) on any interest accrued on late-paid child support payments.

Plaintiffs also contend that the court erred in granting summary judgment in favor of the CSEA regarding the Plaintiffs' request for an accounting of "accrued interest on monies paid into the interest bearing account since 1987 ... because members of the Plaintiff [C]lass have no cognizable property interest in such interest," as discussed above.

Although the court ruled against the Plaintiffs regarding their claim to interest earned on delinquent child support payments, the court reserved the issues regarding entitlement to the corpus of any delinquent child support payments for trial because there was a genuine issue of material fact of whether such payments existed. As stated *supra*, the issue of whether there were delinquent payments was tried, with Kemp being the only custodial parent class member providing testimony. As mentioned before, after the trial, the court concluded that "the strong weight of uncontroverted evidence indicates that after the initial problems of 1998, and *excluding situations involving 'bad addresses' or other 'holds' on disbursement authorized by law*, the CSEA has been disbursing the *overwhelming majority* of child support payments received that are subject to [HRS] § 571–52.2(e) within two days of its receipt of the forwarded checks." [28] (Emphases added).

CSEA, however, argues that Plaintiffs' challenge to the court's ruling on interest and accounting therewith is "moot" inasmuch as Plaintiffs failed to challenge the "court's finding of non-delinquency." CSEA argues that this failure on the part of Plaintiffs renders the court's finding binding on this court.

However, as Plaintiffs maintain, it appears that the CSEA misconstrues the court's finding. The court found that as a result of the transition from the KFRI system to the KEIKI system, "glitches occurred, resulting in delay of child support payments for several months." The court also determined that payments to Kemp were not paid on time. The court observed that millions of dollars in the "bad address" and "uncashed check" categories remained with the CSEA. But, the court also found that an "overwhelming majority" of payments were being made in a timely fashion. Thus, there remained a number of payments that were being disbursed outside of that period. Inasmuch as the CSEA's reliance on the mootness doctrine is grounded on its misinterpretation of the court's finding in this regard, the mootness doctrine, assuming it was germane, is inapplicable.

The question remains as to whether Plaintiffs have a property right in the interest earned on child support payments not disbursed within the statutory time period. The court observed that Plaintiffs "specifically assert that they are not requesting recognition of a property interest based on Title IV–D but rather based on Hawaii law, the Hawaii State Constitution, and the [United States] Constitution[,]" and further ruled that "the governing federal statutes and federal regulations are silent on the issue of interest." Apparently, Plaintiffs specifically requested relief under HRS § 571–52.2(e).[29]

---

of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

27. HRS § 662–8 (1993) provides that "[o]n all final judgments rendered against the State in actions instituted under this chapter, interest shall be computed at the rate of four per cent a year from the date of judgment up to, but not exceeding, thirty days after the date of approval of any appropriation act providing for payment of the judgment."

28. As noted, Kemp was the only custodial parent to testify that she had received payments late.

29. Plaintiffs argue that "[t]he legislative history of [HRS] § 571.52.2(e) reflects a recognition by the [l]egislature that custodial parents urgently need support payments and ... shows a concern that the payments ... be transmitted ... as quickly as possible" and that "[t]here is no language in either the statute or the legislative history to indicate ... any intent ... to provide the CSEA with a financial windfall if it failed to follow the legislative mandate to get the money out to the proper person within the timeframe provided by law." These arguments, however, do not establish Plaintiffs' entitlement to accrued interest in the CSEA funds under the statute.

With respect to the existence of a property interest, the court relied on *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), for the general proposition that "[p]roperty interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

The court noted that Plaintiffs, in seeking declaratory relief, specifically requested a ruling from the court that "any accrued interest on child support funds in interest bearing accounts created pursuant to [HRS] § 576D–10 after the expiration of the statutory period(s) under [HRS] § 571–52.2(e) is the obligee's property." In footnote 2 of the Summary Judgment Order, the court recognized the possibility of a property right in interest:

> Although there appears to be case law requiring "interest" or "blight damages" to be paid when payment after a "taking" has occurred, see e.g., [*Kashiwa v. Coney* ], 45 Haw. 650, 657–59, [372 P.2d 348, 352–53] (1962), the court has been unable to find any Hawaii cases holding that a *delay in payment constitutes a taking*. If the child support payments have been wrongfully withheld, then the court agrees that, as under *Bennett[ v. White*, 865 F.2d 1395 (3d Cir.1989)], a taking has occurred; it is then possible that pursuant to *Kashiwa*, [45 Haw. at 657, 372 P.2d 348,] equitable entitlement to interest may exist. *See also, Schneider v. [Cal. Dep't of Corr.*], 151 F.3d 1194 (1998), for a discussion on the common law "interest follows principal" rule, which apparently is an entrenched rule under English common law, which may apply in Hawaii pursuant to [HRS] § 1–1 [(1993)]. *Plaintiff's declaratory relief request (3), however, specifically requests a ruling that any accrued interest on child support funds in interest bearing accounts created pursuant to [HRS] § 576D–10 after the expiration of the statutory period(s) under [HRS] § 571–52.2(e) [(the two day payment requirement)] is the obligees' property—the court rules that it is not.*

(Emphasis in original and emphasis added.)

As earlier noted, in granting partial summary judgment in favor of the CSEA, the court held that neither Kemp nor members of the Plaintiff Class have "cognizable State constitutional property interest[s] based on [HRS] § 571–52.2(e) on any interest accrued on late-paid child support payments." A review of the statutes cited by the court in its ruling confirms that the statutes are silent as to whether Plaintiffs possess a property right in the accrued interest for payments disbursed outside of the two-day period.[30]

The court determined that Plaintiffs do not have a property right to interest based on the court's interpretation of the relief sought by Plaintiffs. Inasmuch as the court's interpretation of the relief sought by Plaintiffs is not challenged on appeal, it cannot be said that the court was wrong in its ruling that the CSEA was entitled to partial summary judgment on the basis that Plaintiffs "have no cognizable State constitutional property interest based on [HRS] § 571–52.2(e) on any interest accrued on late-paid child support payments."

As related by the court in the quoted footnote above, case law exists as to the possibility of a property right under the common law "interest follows principal" rule. *See generally, Schneider*, 151 F.3d at 1199–1201 (providing a background and relevant case law on the common law "interest follows principal" rule). However on appeal, Plaintiffs do not argue a common law property right. Under the circumstances, we affirm the court's ruling in this respect.

### B.

Given that in this case Plaintiffs do not have a property right to the accrued interest on CSEA's delayed disbursements under HRS § 571–52.2(e), it follows that Plaintiffs are not entitled to an accounting of these funds. Hence, no reason exists to disturb the court's ruling with regard to Plaintiffs' second argument on cross-appeal.

---

**30.** *See supra* note 13.

## XIV.

### A.

Plaintiffs' final issue on appeal is that the court erred in finding that the CSEA did not have an implied contractual duty to disburse payments within the time frame provided by law.[31] In its Memorandum of Decision, the court stated that

> the various cases in which "implied contracts" were found to exist are distinguishable from the case at hand. Importantly, they involved two party transaction[ ] situations, as compared to the facts of this case, which involves at least four parties.... In addition ... contracts are found where it appears the parties intended to enter into a contractual relationship, and "implied contracts" also require the existence of a mutual intent to contract. The court does not find that the statutory scheme involved in this case evidences an intent to contract. The law creates statutory and fiduciary obligations, but no implied contract exists.

With respect to implied contracts, this court has stated as follows:

> An implied contract, in the proper sense, is where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from *their acts*, as in the case where a person performs services for another, who accepts the same, the services not being performed under such circumstances as to show that they were intended to be gratuitous, or where a person performs services for another on request.

*Durette v. Aloha Plastic Recycling*, 105 Hawai'i 490, 504, 100 P.3d 60, 74 (2004) (emphasis added) (internal citations and quotation marks omitted) (citing *Wall v. Focke*, 21 Haw. 399, 404–05 (Haw.Terr.1913)).

Based on this definition, it is apparent that the court's determination that no implied contract exists between the CSEA and obligees was correct. The essential element of an implied contract that is missing from this factual situation is an apparent *mutual intent to form a contract*. Pursuant to the definition employed above, the intent to incur mutual obligations is implied from the *actions* of the parties. Contrastingly, in the instant situation, the mutual obligations are created by a complex and comprehensive statutory and regulatory structure which creates obligations for the agency, the non-custodial parent, and the non-custodial parent's employer. The *actions* of these parties do not create the obligations, therefore, they cannot be said to create an implied contract. Based on the foregoing reasoning, the conclusion of the court that no implied contract existed is affirmed.

### B.

As stated *supra*, in conjunction with their argument that an implied-in-fact contract existed, Plaintiffs assert in their reply brief on cross-appeal that "a transaction such as this ... contains all the elements of a bailment." Plaintiffs make this argument for the first time on appeal. "As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." *State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003); *see also State v. Hoglund*, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) (stating that "[g]enerally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal[ ]"). Accordingly, this argument has not been preserved for appeal and we do not address it.

## XV.

For the foregoing reasons, with respect to CSEA's appeal, the July 16, 2003 Final Judgment of the court is vacated in part and remanded with instructions to dismiss that part of the Final Judgment determining that (1) the CSEA breached its fiduciary duty to obligees in the "uncashed check" and "bad address" categories; (2) Kemp was an adequate representative of the Class; and (3) Plaintiffs were entitled to attorneys' fees and costs, but is affirmed in other respects.[32]

---

**31.** As stated *supra*, in conjunction with their third point on appeal, Plaintiffs maintain that "CSEA had an implied contractual duty to disburse child support payments in a timely manner." Plaintiffs use the terms "timely manner," "within the statutory period of time," and "within the statutory time." We assume that they mean within the two day statutory period by all three references.

**32.** *See supra* note 3.

With respect to the Plaintiffs' Cross–Appeal, we affirm (1) the conclusions in the Summary Judgment Order that Plaintiffs had no cognizable property interest in any interest earned by delinquent payments and, thus, had no right to an accounting and (2) the conclusion in the Final Judgment that the CSEA had no implied contractual duties to obligees in the "uncashed check" and "bad address" categories.

